TATSUKICHI KUWABARA v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. August 4, 1919.)

No. 3161.

ALIENS ⬦50—IMMIGRATION—EXCLUSION—TEACHERS—"LABORER."
    Immigration Act, § 3, excluding contract laborers, but providing that such provisions "shall not be held to exclude * * * persons belonging to any recognized learned profession," *held* not to exclude a Japanese alien, seeking admission for the purpose of teaching the Japanese language, history, geography, and arithmetic in an established school, because (1) the doing so is not to perform labor within the meaning of the act, and (2) such teacher may properly be regarded as belonging to a recognized learned profession.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Laborer.]

Appeal from the District Court of the United States for the District of Hawaii; Horace W. Vaughan, Judge.

Habeas corpus by Tatsukichi Kuwabara against the United States. From a judgment discharging the writ, petitioner appeals. Reversed.

This is an appeal from a judgment dismissing a writ of habeas corpus the court below had granted the appellant upon a petition presented by him setting forth, among other things, that he is a subject of the Emperor of Japan and

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

came from that empire to Hawaii July 12, 1917, by a certain named steamship, having a duly authenticated passport issued by the proper authorities of Japan, showing that he is a teacher; that he left Japan for the purpose of engaging in the practice of his profession as a teacher in Hawaii; that he is imprisoned and restrained of his liberty by the United States Immigration Inspector at Honolulu, the cause of such imprisonment being that the United States Board of Immigration Inspectors at that port had ordered the petitioner to be deported and returned to Japan, his imprisonment and restraint being for the purpose of such deportation.

By stipulation of the parties there was added to the petition for the writ the testimony presented by the petitioner to the Board of Immigration Inspectors by whose order the petitioner was denied a landing, and upon which testimony the board based its order of deportation, and there was also added to the petition a statement of the fact that the petitioner had appealed from that order to the Secretary of Labor at Washington, which appeal was by that officer denied. After argument upon the record thus made the court below dismissed the writ.

Lightfoot & Lightfoot, of Honolulu, T. H., for appellant.

S. C. Huber, U. S. Atty., of Honolulu, T. H., and Annette Abbott Adams, U. S. Atty., and Ben F. Geis, Asst. U. S. Atty., both of San Francisco, Cal.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). Section 3 of the Act of February 5, 1917, entitled "An act to regulate the immigration of aliens and the residence of aliens in the United States" (39 Stat. 875, c. 29 [Comp. St. 1918, § 4289¼b]), provides, among other things as follows:

"That the following classes of aliens shall be excluded from admission into the United States: * * * Persons hereinafter called contract laborers, who have been induced, assisted, encouraged, or solicited to migrate to this country by offers or promises of employment, whether such offers or promises are true or false, or in consequence of agreements, oral, written or printed, express or implied, to perform labor in this country of any kind, skilled or unskilled: * * * Provided further, that skilled labor, if otherwise admissible, may be imported if labor of like kind unemployed cannot be found in this country, and the question of the necessity of importing such skilled labor in any particular instance may be determined by the Secretary of Labor upon the application of any person interested, such application to be made before such importation, and such determination by the Secretary of Labor to be reached after a full hearing and an investigation into the facts of the case: Provided further, that the provisions of this law applicable to contract labor shall not be held to exclude professional actors, artists, lecturers, singers, nurses, ministers of any religious denomination, professors of colleges or seminaries, persons belonging to any recognized learned profession, or persons employed as domestic servants: * * * Provided further, that the Commissioner General of Immigration with the approval of the Secretary of Labor shall issue rules and prescribe conditions, including exaction of such bonds as may be necessary, to control and regulate the admission and return of otherwise inadmissible aliens applying for temporary admission. * * * *"

The act also provided for the appointment of boards of special inquiry "by the Commissioner of Immigration or inspector in charge at the various ports of arrival as may be necessary for the prompt determination of all cases of immigrants detained at such ports under the provisions of the law," to consist of three members to be selected from such of the immigrant officials in the service as the Commission-

er General of Immigration, with the approval of the Secretary of Labor, should from time to time designate as qualified to serve on such boards, and provided for an appeal to the Secretary of Labor from the decision of a majority of such board denying the right of the alien to enter this country.

The pertinent evidence bearing upon the right of the appellant to enter the country consists of his own testimony and of the statement in the record that the applicant is possessed of a passport issued by the Japanese Minister for Foreign Affairs April 11, 1917, which passport states that he "is a teacher and that he is going to proceed to Hawaii as a teacher." The appellant testified before the Board of Special Inquiry, among other things, that a Mr. Shiji, of the Hongkong Mission in Honolulu, left Japan the year before for Hawaii as a Buddhist priest, at which time the witness told him that he would like to go to Hawaii as a teacher, if he could, and that subsequently Shiji wrote him a letter, with the Japanese Consul General's certificate, in which he said that there were many Japanese language schools in Hawaii, and that if the witness should come there he could get him a position in any place, mentioning Lahaina, if he should like to go there, and also mentioning a school on the island of Oahu. Asked what kind of a certificate from the Japanese Consul General Shiji sent him, the witness answered:

"The Hongwanji Mission made application to the Japanese consul, and stated that they wanted a Japanese language teacher, and the Consul General certified for a passport. Q. Could you not have secured a passport anyhow, without the Consul General's certificate, being a teacher? A. No; I could not get it without the Consul General's certificate from here (Hawaii). Q. Cannot all teachers get passports? A. No."

The witness further testified in effect that he attended the common school in Japan for 8 years, and finished the grammar school, and then entered the Hiroshima Ken Normal School, and went there for 4 years, and graduated March 28, 1904. The witness also testified that he had been engaged in teaching 13 years, having taught 5 years in the grammar school at Numata Hiroshima Ken, Japan, and having had charge of the Ochihai Grammar and Manual Training School for 6 months. He further testified that his intention was to go to Hongwanji School at Lahaina, Maui, to teach the Japanese language, history, geography, and arithmetic. Being asked, "In what grades are you going to teach?" he answered, "Grammar grade; but I can teach higher than that."

The question in the case is whether such a teacher is precluded by the Act of Congress of February 5, 1917, from entering the United States, which act, as has been seen, excludes "contract laborers, who have been induced, assisted, encouraged, or solicited to migrate to this country by offers or promises of employment, whether such offers or promises are true or false, or in consequence of agreements, oral, written or printed, express or implied, to perform labor in this country of any kind, skilled or unskilled," but which in express terms exempts from the provisions of the act "professional actors, artists, lecturers, singers, nurses, ministers of any religious denomination,

professors of colleges or seminaries, persons belonging to any recognized learned profession, or persons employed in domestic service."

The Act of Congress of February 26, 1885 (23 Stat. 332, c. 164), entitled "An act to prohibit the importation and migration of foreigners and aliens under contract or agreement to perform labor in the United States, its territories, and the District of Columbia," provided in its first section that it should "be unlawful for any person, company, partnership, or corporation, in any manner whatsoever, to prepay the transportation, or in any way assist or encourage the importation or migration of any alien or aliens, any foreigner or foreigners, into the United States, its territories, or the District of Columbia, under contract or agreement, parol or special, express or implied, made previous to the importation or migration of such alien or aliens, foreigner or foreigners, to perform labor or service of any kind in the United States, its territories, or the District of Columbia."

An alien residing in England was employed by the Church of the Holy Trinity, in the city of New York, to come to that city and take charge of its church as its pastor. It being claimed on the part of the government that the church corporation in making that contract had violated that provision of the Act of February 26, 1885, it was held by the trial court that the defendant was liable to the penalty provided for therein. But on appeal to the Supreme Court (Church of Holy Trinity v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226), the judgment was reversed; that court holding that, while the contract complained of came within the letter of the statute, it did not come within the intent or spirit thereof, and that the statute had no application to such a case, the court saying, among other things:

"It must be conceded that the act of the corporation is within the letter of this section, for the relation of rector to his church is one of service, and implies labor on the one side with compensation on the other. Not only are the general words 'labor' and 'service' both used, but also, as it were to guard against any narrow interpretation and emphasize a breadth of meaning, to them is added 'of any kind,' and, further, as noticed by the Circuit Judge in his opinion, the fifth section, which makes specific exceptions, among them professional actors, artists, lecturers, singers, and domestic servants, strengthens the idea that every other kind of labor and service was intended to be reached by the first section. While there is great force to this reasoning, we cannot think Congress intended to denounce with penalties a transaction like that in the present case. It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act."

The court in that case, after citing numerous cases in support of its ruling, as well as citing the title of the act, said, at page 463 of 143 U. S., at page 513 of 12 Sup. Ct. (36 L. Ed. 226):

"Again, another guide to the meaning of a statute is found in the evil which it is designed to remedy; and for this the court properly looks at con-

temporaneous events, the situation as it existed, and as it was pressed upon the attention of the legislative body. United States v. Union Pacific Railroad, 91 U. S. 72, 79 [23 L. Ed. 224]. The situation which called for this statute was briefly, but fully, stated by Mr. Justice Brown, when, as District Judge, he decided the case of United States v. Craig [C. C.] 28 Fed. 795, 798: 'The motives and history of the act are matters of common knowledge. It had become the practice for large capitalists in this country to contract with their agents abroad for the shipment of great numbers of an ignorant and servile class of foreign laborers, under contracts, by which the employer agreed, upon the one hand, to prepay their passage, while, upon the other hand, the laborers agreed to work after their arrival for a certain time at a low rate of wages. The effect of this was to break down the labor market, and to reduce other laborers engaged in like occupations to the level of the assisted immigrant. The evil finally became so flagrant that an appeal was made to Congress for relief by the passage of the act in question, the design of which was to raise the standard of foreign immigrants, and to discountenance the migration of those who had not sufficient means in their own hands, or those of their friends, to pay their passage.' "

The subsequent case of United States v. Laws, 163 U. S. 258, 16 Sup. Ct. 998, 41 L. Ed. 151, presented the question whether a contract made with an alien in a foreign country, to come to the United States as a chemist on a sugar plantation in Louisiana, in pursuance of which contract the alien did come here and was so employed, his expenses being paid by the defendant to the proceeding, was such a contract to perform labor or services as was prohibited by the same act of Congress, to wit, the Act of February 26, 1885, and the court in holding that it was not, after referring to the amendment of the Act of February 26, 1885, by that of March 3, 1891 (26 Stat. 1084, c. 551), by which amendment the proviso to the fifth section of the former act was made to read so that the provision thereof should not "apply to professional actors, artists, lecturers, or singers, nor to persons employed strictly as personal or domestic servants, nor to ministers of any religious denomination, nor to persons belonging to any recognized profession, nor professors of colleges and seminaries," said:

"This amendment to the statute of 1885, although passed subsequently to the decision in the Circuit Court and prior to the decision of the same case in this court, was not mentioned in the opinion in this court, because the review was had upon the record based upon the act as originally passed in 1885. If by the terms of the original act the provisions thereof applied only to unskilled laborers whose presence simply tended to degrade American labor, the meaning of the act as amended by the act of 1891 becomes, if possible, still plainer. Now by its very terms it is not intended to apply to any person belonging to any recognized profession. We think a chemist would be included in that class. Although the study of chemistry is the study of a science, yet a chemist who occupies himself in the practical use of his knowledge of chemistry as his services may be demanded may certainly at this time be fairly regarded as in the practice of a profession. One definition of a profession is an 'employment, especially an employment requiring a learned education, as those of divinity, law, and physic.' Worcester's Dictionary, title 'Profession.' In the Century Dictionary the definition of the word 'profession' is given, among others, as 'a vocation in which a professed knowledge of some department of science or learning is used by its practical application to the affairs of others, either in advising, guiding, or teaching them, or in serving their interests or welfare in the practice of an art founded on it. Formerly, theology, law, and medicine were specifically known as the professions; but as the applications of science and learning are extended to other departments of affairs, other vocations also receive the name. The word implies professed

attainments in special knowledge, as distinguished from mere skill; a practical dealing with affairs, as distinguished from mere study or investigation; and an application of such knowledge to uses for others as a vocation, as distinguished from its pursuits for its own purposes.'"

In the case of Scharrenberg v. Dollar S. S. Co. et al., 229 Fed. 970, 144 C. C. A. 252, Ann. Cas. 1917C, 258, this court held that it was not a violation of the Immigration Act of February 20, 1907 (34 Stat. 900, c. 1134), making it a misdemeanor to prepay the transportation or assist in the importation of contract laborers into the United States, for the operators of a merchant vessel flying the American flag to bring aliens from China, which decision was affirmed by the Supreme Court in 245 U. S. 122, 38 Sup. Ct. 28, 62 L. Ed. 189, where the court, after referring to the claim there made that the seaman described in each count of the complaint was an alien contract laborer, and that the steamship was a part of the territory of the United States, and that therefore the contracting to bring such alien to San Francisco and to there employ him upon such a vessel, was to knowingly assist and encourage the migration of an alien contract laborer into the United States for the purpose of having him perform labor therein in violation of the fourth and fifth sections of the act of 1907, said:

"The validity of this claim, and of the argument in support of it, calls for the construction of three short provisions of two statutes.

"Section 2 of the act of 1907, as amended in 1910 (36 Stat. 263), furnishes this definition of 'contract laborers,' which must be read into sections 4 and 5 of the act of 1907: 'Persons * * * who have been induced or solicited to migrate to this country by offers or promises of employment or in consequence of agreements, oral, written or printed, express or implied, to perform labor in this country of any kind, skilled or unskilled.'

"Section 4 makes it a misdemeanor for any corporation to 'in any way assist or encourage the importation or migration of any contract laborer or contract laborers into the United States.'

"Section 5 imposes severe penalties for every violation of the act 'by knowingly assisting, encouraging, or soliciting the migration or importation of any contract laborer into the United States.'

"Thus a contract laborer is one who under the conditions described in the first of these statutes comes 'to perform labor in this country,' and the penalties denounced by the sections of the other act are against persons who knowingly assist or induce the importation or migration of such laborer 'into the United States.'

"The purpose of this alien labor legislation was declared by this court almost 30 years ago, in Holy Trinity Church v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226, to be, to arrest the bringing of an ignorant, servile class of foreign laborers into the United States, under contract to work at a low rate of wages, and thus reduce other laborers engaged in like occupations to the level of the assisted immigrant.

"Having these terms of the statutes and this history in mind, can it with reason be said that the men shipped on the Mackinaw as 'seamen' were 'laborers,' and that when employed upon that vessel in foreign commerce they were performing labor 'in this country' within the meaning of the acts?

"In familiar speech a 'seaman' may be called a 'sailor' or a 'mariner,' but he is never called a 'laborer,' although he doubtless performs labor when assisting in the care and management of his ship; and a 'seaman' is defined in the United States statutes applicable to 'merchant seamen' as being, any person (masters and apprentices excepted) who shall be employed to serve in any capacity on board a vessel. R. S. § 4612. In the shipping articles, which the United States law requires shall be signed by members of the crews of ships of American registry engaged in foreign commerce, the men are desig-

nated as 'seamen' or 'mariners.' Thus, neither in popular nor in technical legal language would the men employed on the Mackinaw be called or classed as 'laborers,' and such seamen are not brought 'into this country' to enter into competition with the labor of its inhabitants, but they come to our shores only to sail away again in foreign commerce on the ship which brings them or on another, as soon as employment can be obtained."

We are of the opinion that, in view of the purpose of the legislation here in question, as declared by the Supreme Court in the cases that have been cited, it cannot be held to apply to an alien who seeks to enter this country for the purpose of teaching "the Japanese language, history, geography, and arithmetic," first, because the doing so is not to perform labor in this country within the meaning of the Act of February 5, 1917; and, secondly, because a teacher of the Japanese language, history, geography, and arithmetic may be properly regarded as belonging to a "recognized learned profession."

The judgment is reversed, and the case remanded, with directions to the court below to discharge the appellant from custody.