MATTER OF C——Y——L——

In DEPORTATION Proceedings

A-8944627

*Decided by Board June 10, 1959*

Guam—Temporary admissions prior to 1952—Presumption of lawful residence under 8 CFR 4.2(j) [now 8 CFR 101.1(i)].

Contract laborers—Restaurant manager, supervisory cook and baker not within definition.

Group of 12 aliens temporarily admitted to Guam prior to 1952 under contract to food concessionaire to United States Armed Forces, who were intended for employment in supervisory capacity as restaurant manager, cook, or baker, who were occupationally qualified, and who were actually so employed, were not classifiable as contract laborers under the Immigration Act of 1917. Hence, they are entitled to the presumption of lawful permanent residence accorded by 8 CFR 4.2(j) [now 101.1(i)].

CHARGE:

Warrant: Act of 1952—Section 241(a)(9) [8 U.S.C. 1251(a)(9)]—Failed to maintain status—Contract laborer.

### BEFORE THE BOARD

**Discussion:** Respondent is a 38-year-old married male alien, a native and citizen of China. His last and only entry into the United States was at the Naval Air Station, Agana, Guam, on March 6, 1951. On December 9, 1955, the special inquiry officer ordered respondent deported on the ground that he was a contract laborer who failed to maintain the status in which he was admitted, in that he remained in the United States after the date on which his authorized stay terminated. On appeal, we found that respondent was not a contract laborer and is entitled to the presumption of permanent residence contained in 8 CFR 4.2(j)[1] [now 8 CFR

---

[1] 8 CFR § 4.2 *Presumption of lawful admission.* An alien of any of the following-described classes shall be presumed to have been lawfully admitted for permanent residence within the meaning of the Immigration and Nationality Act (even though no record of his admission can be found, except as otherwise provided in this part) unless the alien abandoned his status as a lawful permanent resident, or lost such status by operation of law, at some time subsequent to such admission: * * * (j) *Aliens admitted to Guam.* (1) An alien who establishes that he was admitted to Guam prior to December 24, 1952, by records, such as Service records subsequent to June 15, 1952, records of the Guamanian Immigration Service, records of the Navy or Air Force, or records of contractors of those agencies, other than as a contract laborer, was not otherwise excludable under the Act of February 5, 1917, as amended, and who continued to reside in Guam until December 24, 1952, regardless of the period of time for which admitted.

101.1(i)]. On motion of the Commissioner of the Immigration and Naturalization Service that the record be reopened for the introduction of additional evidence, we withdrew our order of August 31, 1956, and remanded the record for further proceedings.

On September 3, 1958, the special inquiry officer found that respondent was brought to Guam for the purpose of being employed as a manager, that this is a position of a "mental nature" and that he was not, therefore, a contract laborer at the time of his arrival excludable under section 3 of the Immigration Act of 1917. The special inquiry officer found that respondent is entitled to the presumption contained in 8 CFR 4.2(j) and terminated the proceedings against him. The case was certified to the Board. When these cases were previously before us we chose C——Y——L—— as the leading case, and the principal decision related to him. Much of the general testimony and many of the exhibits were entered by the special inquiry officer in the record under his name and case number. Therefore, we will continue it as the leading case, even though proceeding as to him have been terminated.

C——L——C—— and M——, a partnership, and its successor corporation, Far East Trading Company, Inc., were concessionaires operating restaurants, cafes, snack bars, two (or three) bakeries, ice cream plants, a milk-bottling operation and maintenance facilities on Army and Air Force installations throughout Guam from December 1947 until some time in 1953. The record shows that Mr. C——L——C—— had engaged in similar activities in the Philippine Islands, beginning with his operation of the officers clubs in Manila in 1919. In 1947, Mr. M—— was Food Service Director, United States Army, in the Philippines. During 1951 they operated 20 such outlets on Guam and employed probably 300 persons. This case comes before the Board with a group of similar cases concerning Chinese aliens who were imported into Guam for the purpose of employment by C—— and M——, and who are still employed by Far East.

Mr. C—— and Mr. M—— have both testified that they attempted at first to operate their concessions on Guam with Filipino and local labor. After a few months they discovered they were on the verge of losing their substantial investment and informed the military authorities on Guam that they would be unable to continue unless they were permitted to import from the Philippines skilled and supervisory personnel who had been employed by them in the past. They were given permission to bring 30 Chinese employees to the island, and military security later increased the allowable number to 60. All personnel held permanent residence permission in the Republic of the Philippines and were screened by United States military authorities before proceeding to Guam. The record

372

show that all respondents had been employed by Mr. C—— prior to coming to Guam, except, perhaps, where the respondent claims the record does not accurately describe his experience and employment history. The employers testify, and we see no reason to question the reasonableness of their assertions, that they attempted to bring in persons who were experienced bakers, cooks, cashiers, and managers, who would give the operations on Guam the kind of supervision needed, who could purchase and distribute supplies, handle cash receipts, and instruct and supervise the rest of the staff. The employing corporation lost its concessions with the armed services in 1953, operations being taken over at that time by the Post Exchange. Respondents are now employed on Guam at restaurants owned and operated by the former employers.

All of the aliens included in this group are designated by **Far East** as managers, chief cooks, and chief bakers, and have been paid monthly salaries plus expenses and yearly bonuses from the time they first came to Guam. The special inquiry officer found that four of the twelve respondents were not contract laborers at the time of entry, and terminated proceedings as to them. Proceedings were terminated as to C——Y——L——, A–8944627 (instant case), who was found to be a manager; L——L——, A–8944604, found to be a manager; Y——S——, A–8944606, found to be a chief cook; and T——T——, A–8944635, found to be a chief baker. We agree with the special inquiry officer that respondent was not a contract laborer at the time of his arrival and was not, therefore, excludable on that ground under section 3 of the Immigration Act of 1917. It is necessary to determine why the special inquiry officer distinguished between this respondent and the others as to whom proceedings were not terminated.

It is contended by the Immigration and Naturalization Service that the Immigration Act of 1917, as amended, was applicable to Guam and constituted the immigration law of Guam, at the time of respondent's arrival there, even though the statute was not enforced in that area, and that the aliens, including respondent, necessarily were brought into Guam under that law. Section 3 of the Immigration Act of 1917 forbids the importation of contract labor for permanent residence.[2] However, the 9th proviso to section 3 permits the importation of contract labor for temporary periods, un-

---

[2] Section 3, Immigration Act of 1917, as amended, provides: "That the following classes of aliens shall be excluded from admission into United States: * * * persons hereinafter called contract laborers, who have been induced, assisted, encouraged, or solicited to migrate to this country by offers or promises of employment, whether such offers or promises are true or false, or in consequence of agreement, oral, written or printed, express or implied, to perform labor in this country of any kind, skilled or unskilled * * *."

der prescribed rules and conditions.[3] The special inquiry officer found that because importation of the respondents as contract laborers for permanent residence was forbidden, necessarily they were admitted temporarily under the 9th proviso.

Respondent contends that since the record does not show for what period of time he was admitted nor in what status, necessarily he was admitted for permanent residence. Counsel argues, first, that the Immigration Act of 1917, as amended, had no application to Guam; that it was never enforced in Guam; that the Organic Act of Guam, effective on August 1, 1950, indicated that the 1917 act was not intended to apply to Guam; and that respondent was, therefore, admitted at the time of his first entry for permanent residence by those responsible for enforcement of law on Guam.

The special inquiry officer refers to the Penal Code of Guam which became effective on February 1, 1934 and remained effective until July 14, 1953. He states that it enumerated in section 175 thereof the classes of aliens who would be excludable from admission into the Island of Guam (exh. SF-1 attached to deposition exh. R-8). The classes enumerated are similar to those set forth in section 3 of the Immigration Act of 1917. In addition, subparagraph (k) of section 175 included in the excludable classes, "All persons who are prohibited by United States law from entering any United States possession." The special inquiry officer concludes from section 175 of the Penal Code that "it is clear that the applicability of the Immigration Act of 1917 to Guam was recognized in the enactment of the Penal Code." The applicability of the 1917 act to Guam was not clearly recognized by the Deputy Chief of Naval Operations in 1948, nor the Immigration Service. See discussion of background material in our decision *Matter of S——*, 3 I. & N. Dec. 589, at 599 and 600 (April 26, 1949). It seems clear that the exclusion provisions of the Immigration Act of 1917 were used as a model in the enactment of the Penal Code of Guam, followed for the sake of convenience and consistency.

Section 25(b) of the Organic Act of Guam provided for the appointment by the President of the United States of a commission of 7 persons to ascertain which Federal statutes not applicable to Guam should be made applicable and which statutes applicable to Guam should be declared inapplicable. Organic Act of Guam, 64 Stat. 384, section 25(b). A Commission on the Application of the Federal Laws to Guam was appointed by the President pur-

---

[3] Section 3, Immigration Act of 1917, as amended, provides: "* * * *Provided further*, [9] That the Commissioner of Immigration and Naturalization with the approval of the Attorney General shall issue rules and prescribe conditions, including exaction of such bonds as may be necessary, to control and regulate the admission and return of otherwise inadmissible aliens applying for temporary admission * * *."

suant to this statute. The findings of this Commission were not part of the record when this case last came before us, but we rejected counsel's contention at that time that until such a report was made and *acted upon* the Immigration Act of 1917 was ineffective in Guam. The report of the Commission made in 1951 is now part of the record (exh. R–22A, exh. R–22B, p. 62). The Commission found that the Immigration Act of 1917 was applicable to Guam and that there was nö need for any change in its applicability. It seems to us that for the purposes of the present appeals this determination settles the issue. The 1917 act did apply to Guam, even though there was no one there to enforce it, and even though a completely different body of regulations and orders were being enforced. In *Ex parte Rogers*, 104 F. Supp. 393 (D.C. Guam, May 9, 1952), the court held that the Immigration Act of 1917, as amended, is applicable to Guam; that Guam is included by the definition in section 1 of that statute; and that the Government of Guam had the residual authority to enforce the immigration laws of the United States in default of performance by the United States Immigration and Naturalization Service.

The special inquiry officer and counsel discuss a number of statutes, regulations and instructions relating to the control of immigration into Guam which were effective during the period from 1948 through 1952. In addition to the Immigration Act of 1917 and the Organic Act of Guam of August 1, 1950, as amended, and the Penal Code of Guam there were Executive Order No. 8683 establishing naval defensive sea areas around and naval air space reservations over the islands of Rose, Tutuila and Guam, signed on February 14, 1941 (exhs. W–1 and W–2 attached to exh. R–7); Civil Regulations with the force and effect of law in Guam, promulgated by the Acting Secretary of the Navy on August 4, 1947 (exh. W–5 attached to exh. R–7); Agreement Between the United States and the Republic of the Philippines for the Recruitment of Filipino Laborers and Employees by the United States Army, effective by exchange of notes, signed at Manila, May 13 and May 16, 1947 (exh. W–3 attached to exh. R–7); CINCPACFLT Instruction 5521.1A, issued by the Commander-in-Chief, United States Pacific Fleet on November 10, 1952, relating to clearance for travel in the Pacific and adjacent areas (exh. W–7 attached to exh. R–6); and others. There is extensive testimony on the manner in which the statutes, regulations and instructions were applied and enforced on Guam and the procedures followed with respect to the immigration into Guam during the period from 1948 to 1952. The record contains the testimony of Carlton Skinner, Naval Governor of Guam from September 1949 to August 1, 1950, and Civil Governor of Guam from September 1950 to March 1953 (exh. R–8), Admiral Arthur

Radford, Commander-in-Chief, Pacific Fleet, from May 1, 1949, to July 10, 1953 (exh. R-6), Captain William Mott, Chief International Law Officer in the Office of Judge Advocate General of the Navy from 1946 to 1948 and Legal Officer and Island Government Officer on the staff of the Commander-in-Chief, Pacific, and High Commissioner of the Trust Territory of the Pacific Islands from July 1948 to November 1950 (exh. R-7), and others. Apparently all this testimony is designed to demonstrate that no one, including respondent, was admitted to Guam for permanent residence.

We concluded in our previous decision (August 31, 1956, withdrawn) that it was possible that respondents were admitted to the United States as skilled labor under the 4th proviso to section 3 of the 1917 Act.[4] We stated that, while it was true that there was no hearing and determination by the Attorney General prior to the importation as provided by the 4th proviso, the Immigration Service was not operating in that area and such a hearing would not have been possible. On the subject of available labor, the Department of Labor and personnel of the Government of Guam wrote, in part, to the United States Department of Justice, Immigration and Naturalization Service, on December 16, 1953:

This is to advise that we have reviewed the petition of C——L——C—— and M——, Guam, M.I., dated December 16, 1953, regarding the renewal of petition of alien contract laborers.

According to the records of this office there are no qualified workers available locally.

We found that respondents were admitted to Guam by those who were at that time exercising the "residual authority" to enforce the immigration laws, in the absence of the Immigration and Naturalization Service; that they were skilled laborers; and that it might be presumed that they were admitted for permanent residence under the 4th proviso to section 3 of the 1917 act, *if* that act was effective on Guam at the time of their admission.

The record now contains a large amount of evidence establishing that no aliens or citizens were permitted to enter Guam for the purpose of establishing permanent residence without having its first obtained the written permission of the Governor of Guam, and that it was the policy of the Navy, as well as of the Civil Government of Guam, to deny admission to Guam for permanent

---

[4] Immigration Act of 1917, section 3, 4th proviso, provides: "*Provided further,* [4] That skilled labor, if otherwise admissible, may be imported if labor of like kind unemployed can not be found in this country, and the question of the necessity of importing such skilled labor in any particular instance may be determined by the Attorney General upon the application of any person interested, such application to be made before such importation, and such determination by the Attorney General to be reached after a full hearing and an investigation into the facts of the case."

residence. CINCPACFLT Instruction 5521.1A, November 10, 1952, provides:

Entrance of non-United States citizens to permanently reside on Guam or the Trust Territory is contrary to existing policy. Entrance of foreign nationals to Guam or the Trust Territory on a temporary or interim basis will be restricted to very compelling reasons, and then, only under carefully controlled conditions.

On the basis of this instruction and on the basis of Executive Order 8683, rules and regulations regulating the entry of non-United States nationals into the Island of Guam required that all entries be by specific permission of the Commander-in-Chief and were temporary. Aside from security reasons, Admiral Radford testified that the reason for the restriction on the period of stay was that after the termination of the military construction program on Guam, it was not desired that the population of Guam be expanded permanently. Other witnesses also testified that security reasons, plus consideration for the civilian native population, required that the large number of aliens brought into Guam in connection with the military construction program be returned to the point of recruitment. The former Naval and Civil Governor of Guam, Carlton Skinner, testified that, to his knowledge, no aliens were permitted to reside permanently on Guam except for a number of refugee doctors from Europe who were admitted to Guam about 1950 under the 4th proviso to section 3 of the Immigration Act of 1917. In a letter dated March 8, 1950, the Commissioner of Immigration on Guam, E. R. Jones, stated that the laws of Guam did not provide for the granting of permanent residence on Guam (exh. R-16).

Documents now in the record which indicate that respondent's admission into Guam was only temporary, and that this was the understanding of everyone concerned, include: (1) Requests for Clearance to Enter Guam (civilian employee) addressed to "Commanding General, Marianas Bonins Command" signed by the Personnel Director of the Marbo Central Exchange all provide that "Proposed duration of stay on Guam" shall be one year; (2) Employment Agreements between respondents and the employing concessionaire all provide, "Length of Agreement: Your appointment is for a period of one (1) year from date of this agreement, unless terminated sooner by the Concessionaire"; (3) Marbo Central Exchange Officer at Guam on May 12, 1952, requested the Commissioner of Immigration for the Philippines to extend the reentry permits for some of respondents for another year, because they desired to renew their employment agreements on Guam (See P—— C—— C——, A-8944633, record, exh. R-1); (4) Memorandum, June 27, 1951, from the Marbo Central Exchange Officer concerning "Em-

566713—61——26

ployment of Aliens by Civilian Concerns after Termination of Employment with Marbo Central Exchange" (exh. R-13F) states that Command policy prohibits the release of Filipino or Chinese nationals to civilian concerns after termination or breach of contract and that all such personnel must be returned to point of origin upon separation from the Command. This memorandum states further that in accordance with policy established by COMNAVMAR, Chinese nationals who take leave to China and for the Philippines will not be permitted to return to Guam; (5) A letter of September 8, 1947, from Brigadier General Farthing to the Hon. C. A. Pownall, Governor of Guam, requesting reconsideration for the entry of certain Chinese nationals (description clearly relates to a group such as respondents) for a period not to exceed one year, and concludes with a clause which appears several places in the record: "With this control there could be no problem of colonization" (exh. R-13E); (6) A memorandum of August 9, 1949, from the Acting Attorney General of Guam to the Civil Administrator concerning a request for permanent residence status states that the Naval Government of Guam discontinued such grants "over one year ago and the renewed use of this grant now is not considered timely" (exh. R-11). These and other documents, and the testimony of the witnesses referred to above, discussed in more detail by the special inquiry officer, establish that respondents were not admitted for permanent residence upon arrival on Guam under any provision of law.

In the meantime large numbers of construction workers were imported into Guam by the Armed Services and by private companies operating under contracts with the United States Government. The Immigration Service has stated that there are, or were when the present proceedings began, 12,000 alien workers on Guam. Counsel attempted to demonstrate that there have been exceptions to the procedures provided; that there were some persons admitted for permanent residence on Guam; and that groups were brought into Guam without the permission or knowledge of the Immigration Department of the Government of Guam. Juan L. Gumataotao, the Customs and Immigrant Inspector under the Naval Government of Guam from April 16, 1947, to August 1, 1950, and Supervisory Immigration Officer under the Territorial Government of Guam from August 1, 1950, to August 16, 1950, testified that the Armed Forces brought labor into the Island in large numbers without his seeing or approving the admission. Confusion arose from exceptions made in behalf of civilian contractors and their employees traveling under orders issued by the Armed Forces. Mistakes or exceptions may have been made, and they would be almost unavoidable in as large an undertaking as the construction on Guam under

378

wartime conditions.[5] Even so, we fail to see that such mistakes and exceptions affect the status of respondents in the present proceedings, whose position must continue to remain peculiarly their own.

On June 16, 1952, the Immigration and Naturalization Service opened an office on Guam and assumed the responsibility for administering immigration laws in the area. The Immigration and Nationality Act of 1952 clearly includes Guam. The Immigration and Naturalization Service, following the policy pursued by this Government when the Service commenced operations in the Virgin Islands, purported to presume lawful admission for aliens in Guam but made an exception of "contract laborers," by 8 CFR 4.2(j), Fed. Register, December 8, 1954, effective January 3, 1955. See footnote 1. Following the release of our previous decision on August 31, 1956, 8 CFR 4.2(j) was amended on October 26, 1956.[6] The special inquiry officer's excellent statement on the effect of this amendment, with which we concur, is, in part, as follows:

While the purpose of the amendment of 8 CFR 4.2(j) is obvious, the effect of the amendment of the regulation on the respondents herein is not so readily apparent. The residence status of all of the respondents was presented to this Service for adjudication prior to the amendment of the regulation on October 26, 1956. If the respondents became entitled to status as permanent residents under 8 CFR 4.2(j) in the form in which it was originally published on December 8, 1954, it is not deemed that they would be divested of their right to such status by reason of the amendment of the regulation on October 26, 1956. There is nothing in the amended regulation to indicate that it was intended to have retroactive effect. In the absence of such indication the amendment, under the general rule of statutory construction, may be applied retrospectively if it relates to matters that are remedial or procedural but not if vested rights are involved. * * * It is noted also that there is nothing in the regulation which would permit any rebuttal of the so-called "presumption" since the right to permanent residence status would automatically vest in any alien who met the description of any of the classes enumerated in the regulation. Determination of the status of the respondents under 8 CFR 4.2(j) will, therefore, be made on the basis of that regulation as it existed prior to its amendment.

---

[5] Korean War—June 25, 1950, to July 27, 1953 (Armistice signed).

[6] 8 CFR § 4.2(j), as amended October 26, 1956: "(j) *Aliens admitted to Guam.* (1) An alien who establishes that he was admitted to Guam prior to December 24, 1952, by records, such as Service records subsequent to June 15, 1952, records of the Guamanian Immigration Service, records of the Navy or Air Force, or records of contractors of those agencies; that he was not excludable under the Act of February 5, 1917, as amended; and that he continued to reside in Guam until December 24, 1952, and thereafter has not been admitted or readmitted into Guam as a nonimmigrant: *Provided,* That the provisions of this subparagraph shall not apply to an alien who was exempted from the contract laborer provision of section 3 of the Immigration Act of February 5, 1917, as amended, through the exercise, expressly or impliedly, of the 4th or 9th provisos to section 3 of the said act."

Radford, Commander-in-Chief, Pacific Fleet, from May 1, 1949, to July 10, 1953 (exh. R–6), Captain William Mott, Chief International Law Officer in the Office of Judge Advocate General of the Navy from 1946 to 1948 and Legal Officer and Island Government Officer on the staff of the Commander-in-Chief, Pacific, and High Commissioner of the Trust Territory of the Pacific Islands from July 1948 to November 1950 (exh. R–7), and others. Apparently all this testimony is designed to demonstrate that no·one, including respondent, was admitted to Guam for permanent residence.

We concluded in our previous decision (August 31, 1956, withdrawn) that it was possible that respondents were admitted to the United States as skilled labor under the 4th proviso to section 3 of the 1917 Act.[4] We stated that, while it was true that there was no hearing and determination by the Attorney General prior to the importation as provided by the 4th proviso, the Immigration Service was not operating in that area and such a hearing would not have been possible. On the subject of available labor, the Department of Labor and personnel of the Government of Guam wrote, in part, to the United States Department of Justice, Immigration and Naturalization Service, on December 16, 1953:

This is to advise that we have reviewed the petition of C——L——C—— and M——, Guam, M.I., dated December 16, 1953, regarding the renewal of petition of alien contract laborers.

According to the records of this office there are no qualified workers available locally.

We found that respondents were admitted to Guam by those who were at that time exercising the "residual authority" to enforce the immigration laws, in the absence of the Immigration and Naturalization Service; that they were skilled laborers; and that it might be presumed that they were admitted for permanent residence under the 4th proviso to section 3 of the 1917 act, *if* that act was effective on Guam at the time of their admission.

The record now contains a large amount of evidence establishing that no aliens or citizens were permitted to enter Guam for the purpose of establishing permanent residence without having its first obtained the written permission of the Governor of Guam, and that it was the policy of the Navy, as well as of the Civil Government of Guam, to deny admission to Guam for permanent

---

[4] Immigration Act of 1917, section 3, 4th proviso, provides: *"Provided further*, [4] That skilled labor, if otherwise admissible, may be imported if labor of like kind unemployed can not be found in this country, and the question of the necessity of importing such skilled labor in any particular instance may be determined by the Attorney General upon the application of any person interested, such application to be made before such importation, and such determination by the Attorney General to be reached after a full hearing and an investigation into the facts of the case."

perience, skill and administrative capacity, as he recognized when he admitted four of the twelve.

The special inquiry officer found with regard to Y——S——, A–8944606, "as a chief cook the work to be performed by the respondent was primarily supervisory or administrative, although it undoubtedly also involved a certain amount of cooking." We find that all the cooks, bakers and managers are entitled to the same finding.

The available payroll information is tabulated for the purpose of ascertaining the comparative salaries during the same period. See Appendix I. The cooks received approximately the same salaries. They were first admitted to Guam at salaries of $125 to $150 a month except L——H——, A–8944626, who was both a cook and baker and was paid $162.50 from the beginning. The managers received $90 and $100 a month. The three bakers were paid the most—$125, $150, and $170 a month during this period. They also received all living and medical expenses. Mr. M—— testified that respondents were paid by their contracts a yearly bonus equivalent to one month's salary. Mr. C—— testified that the supervisory employees were to be paid such bonuses in lieu of overtime payments, and depending on whether the company showed a profit. The non-supervisory employees—the waiters, busboys, kitchen helpers—received $35 and $40 a month, plus living expenses. Mr. C—— testified that he would not have paid managers' salaries to waiters and that the wage scale paid in his establishments was comparable to that paid by other employers in the area.

The cashiers were to account each day for the tickets, and to receive money, to be responsible for the correct charging of articles sold and for cash and daily records and reports. Sometimes they acted as assistant managers, or managers and were responsible for the manager's fund of two to five hundred dollars which was used for the purchase of necessary items, and for monitoring the work of other employees. Respondents all had some responsibility for training the helpers and apprentices under them, although at the reopened hearings they all felt it necessary to emphasize these activities and to discount any actual cooking or other physical endeavor. Considering the emphasis on titles in these cases it is understandable. Mr. Karl Giesendorfer, Security Supervisor for the Army and Air Force Exchange Service on Guam from July 1948 to January 1958, testified that after C—— and M—— lost its concessions with the Marbo Central Exchange, it was one of his duties to organize the food services for the Exchange. He took over the Filipino personnel of C—— and M—— to operate the food service organization, and he stated that these people had all been trained by the Chinese employees of C—— and M——.

ployment of Aliens by Civilian Concerns after Termination of Employment with Marbo Central Exchange" (exh. R-13F) states that Command policy prohibits the release of Filipino or Chinese nationals to civilian concerns after termination or breach of contract and that all such personnel must be returned to point of origin upon separation from the Command. This memorandum states further that in accordance with policy established by COM-NAVMAR, Chinese nationals who take leave to China and for the Philippines will not be permitted to return to Guam; (5) A letter of September 8, 1947, from Brigadier General Farthing to the Hon. C. A. Pownall, Governor of Guam, requesting reconsideration for the entry of certain Chinese nationals (description clearly relates to a group such as respondents) for a period not to exceed one year, and concludes with a clause which appears several places in the record: "With this control there could be no problem of colonization" (exh. R-13E); (6) A memorandum of August 9, 1949, from the Acting Attorney General of Guam to the Civil Administrator concerning a request for permanent residence status states that the Naval Government of Guam discontinued such grants "over one year ago and the renewed use of this grant now is not considered timely" (exh. R-11). These and other documents, and the testimony of the witnesses referred to above, discussed in more detail by the special inquiry officer, establish that respondents were not admitted for permanent residence upon arrival on Guam under any provision of law.

In the meantime large numbers of construction workers were imported into Guam by the Armed Services and by private companies operating under contracts with the United States Government. The Immigration Service has stated that there are, or were when the present proceedings began, 12,000 alien workers on Guam. Counsel attempted to demonstrate that there have been exceptions to the procedures provided; that there were some persons admitted for permanent residence on Guam; and that groups were brought into Guam without the permission or knowledge of the Immigration Department of the Government of Guam. Juan L. Gumataotao, the Customs and Immigrant Inspector under the Naval Government of Guam from April 16, 1947, to August 1, 1950, and Supervisory Immigration Officer under the Territorial Government of Guam from August 1, 1950, to August 16, 1950, testified that the Armed Forces brought labor into the Island in large numbers without his seeing or approving the admission. Confusion arose from exceptions made in behalf of civilian contractors and their employees traveling under orders issued by the Armed Forces. Mistakes or exceptions may have been made, and they would be almost unavoidable in as large an undertaking as the construction on Guam under

radical—from laborer to merchant and restaurant keeper. In the instant cases, the changes were only of a degree. We must look at the actual work done by respondent, the manner in which he was employed from the time of his arrival to determine the true capacity in which he was to be used. Suppose that a group of illiterates was imported into Guam, all accidentally designated ahead of time as "managers"; suppose further, that following their arrival they were found to be incompetent and were demoted to sweepers the next day. Would it still be contended that the original erroneous designation controls? An employee of C—— and M—— may have been assigned for a few weeks immediately following his arrival on Guam to work as "counterman" in the same establishment where he became manager the following month, but this does not mean that he entered as a laborer. Most of these people were coming to Guam as replacements for those who were returning to the Philippines, or going on leave. One of the personnel people testified that their principal problem was one of "home sickness," and that many of the employees refused to stay on Guam more than three years. It would seem almost inevitable that a new "manager" or even chief cook or baker might break in on a new job under the direction of the departing supervisor.

The records relating to respondents are sparse, partly due to the fact that prior to the arrival of the Immigration and Naturalization Service on Guam in 1952 immigration records were kept in a less precise manner than has been customary under the aegis of the Service. It is also alleged that many of the records of C—— and M—— were destroyed in a typhoon, and that they have moved their offices on Guam many times. Exhibit R–23 is a list of respondents and the wages shown by the first monthly sheets following their entries into Guam. This list carries a note to the effect that the first pay sheets have been turned over to the "United States Immigration, Agana, Guam," as exhibits during the previous trial. There was considerable discussion as to whether or not these pay sheets were turned over to a representative of the Immigration Service, and, if so, their ultimate disposition. So far as we can discover, there is no conclusion as to whether or not the Immigration Service actually received these records, or as to the disposition of them if they did exist.

There are the following kinds of records:

(1) Application and Personal History sheets. Mr. C—— testified that the information forms for each employee were probably filled out by V——Y—— in the Philippines, although the individuals were hired personally by Mr. C——, and that the fact that the form shows that the respondent was entering Guam in the position of checker is not necessarily conclusive that that is the capacity in which he was employed.

The special inquiry officer found that four of respondents, including C——Y——L——, were not contract laborers and, therefore, became entitled to the presumption of lawful admission provided by regulation, but that eight others of this group were contract laborers under the law and hence within the exception. Although the language of the statute forbidding the importation of aliens under contract "to perform labor in this country of any kind, skilled or unskilled" is broad, the tendency of the cases has been to reduce its application. The rule usually cited is from *Ex parte Gouthro*, 296 Fed. 506 (E.D. Mich., 1924) (aff'd *United States* v. *Gouthro*, 8 F.2d 1023 (C.A. 6, 1925)), as follows, at p. 509:

> It must now be regarded as settled that the purpose of Congress in enacting this so-called "contract labor" legislation was to prevent the importation into this country of an ignorant, servile class of foreign laborers, to work at a low rate of wages, and thus reduce other laborers engaged in like occupations to the level of the assisted immigrants, and this provision of the statute does not refer nor apply to persons whose work requires mental, rather than merely manual, effort as its dominant element. *Church of Holy Trinity* v. *United States*, 143 U.S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226; *United States* v. *Laws*, 163 U.S. 258, 16 Sup. Ct. 998, 41 L. Ed. 151; *Scharrenberg* v. *Dollar Steamship Co.*, 245 U.S. 122, 38 Sup. Ct. 28, 62 L. Ed. 189; *Gay* v. *Hudson River Electric Power Co.*, 178 Fed. 499; *Tatsukichi Kuwabara* v. *United States*, 260 Fed. 104, 171 C.C.A. 140 (C.C.A. 9); *United States* v. *Union Bank of Canada*, (C.C.A. 2) 262 Fed. 91, 8 A.L.R. 1438; *Ex parte Aird*, (D.C.) 276 Fed. 954.

*Gouthro* held that a Western Union Telegraph operator was not a contract laborer. *Aird* held that a "class A draftsman" employed by Bethlehem Shipbuilding Corp. was not a contract laborer. We followed these cases in *Matter of S*——, 1 I. & N. Dec. 196 (Feb. 19, 1942). We pointed out that the Immigration and Naturalization Service has held that professional tennis, football, baseball, hockey and soccer players, and professional boxers, are not contract laborers. In that case we held that a ski instructor was not a contract laborer. In *Matter of McL*——, 1 I. & N. Dec. 264 (June 20, 1942), we stated that the Immigration and Naturalization Service has held further that race track jockeys, race track starters, horse grooms and trainers are not contract laborers. We held that a hockey player, temporarily employed in a supervisory or administrative capacity at a public golf course, was not a contract laborer. See also *Matter of B*——, 1 I. & N. Dec. 593 (Nov. 12, 1943); *Matter of MacR*——, 1 I. & N. Dec. 682 (Dec. 16, 1943). The special inquiry officer's decision declares that the basis of these decisions was the fact that the work to be performed by them was not a type which can be considered manual labor. This is where we part company with the special inquiry officer. Respondents were not domestic servants. The services performed by them, mass cooking, baking and supervising in commercial establishments, required ex-

manager of all of the C—— and M—— restaurants on Guam, and that at the time of his statement (exh. 4) he was employed by Far East Trading Company as manager of the Town House Coffee Shop. At the reopened hearing additional records and testimony were obtained, and nothing contradicts the record established in the earlier hearing. Respondent testified on June 3, 1958, that he had worked for C——C—— at Clark Field in the Philippine Islands as cashier, collecting the receipts and disbursing money for wages and supplies at all of C——'s five restaurants at Clark Field from 1946 to 1949.

Respondent was entitled to a finding that he was brought to Guam for the purpose of being employed in a position which does not fall under the contract-labor category, and that he is, therefore, entitled to the presumption contained in 8 CFR 4.2(j) as a person who was lawfully admitted for permanent residence on his arrival on Guam on March 6, 1951. This is in accordance with the order we made on August 31, 1956. The order terminating proceedings as to him was correct.

In summary as to all employees, the record establishes that it was well understood by the employees and the concessionaires on Guam that entry was authorized for periods of one year only. No grant of permanent residence to respondents was made or intended at time of entry. Counsel's continuous objections, that the testimony taken and evidence adduced were not within the scope of the Board's 1956 order reopening the record, were time consuming and were correctly overruled. The order was, and was intended to be, broad in its scope and in its interpretation. The record is much more informative than it was in its previous state.

The four C—— and M—— employees who were admitted by the special inquiry officer are, on the average, better documented than the eight who were not admitted, but the existence of more documents should not determine their right to remain. No single test can determine the classification of contract labor, such as, "Does he perform mental as opposed to menial labor?" We have attempted to look at all the elements—the documents, the skill, experience and competence of the employee, and the manner in which his talents were utilized following his admission. The record establishes that those who were admitted were not supervisory or superior in relation to the others in the group. Appendix I was designed to show the comparative salaries and job designations of the twelve. All were supervisory in relation to the Filipino employees and received three to five times the pay of the kitchen helpers, bus boys and waiters. Each of the bakers was in charge of a different shift, or at a different bakery, at least within a few days of his arrival. Each cook was head cook in a different restaurant. The cooks and bakers

The record indicates that respondents all had, and were expected to have, a certain amount of versatility in the food preparation and purveying field. The bakers were also qualified as cooks. The managers were competent to double as cashiers, checkers and waiters. Several witnesses mentioned that Chinese restaurants are run differently from other restaurants, in that the managers circulate, sometimes taking the orders and serving the food themselves and helping with the cleaning-up. Mr. C—— and Mr. M—— both testified that a degree of versatility is necessary in all lines of work. There was no painful stratification by "job sheets," as there is in the Civil Service system. There was considerable travel among the employees (until these proceedings began), some of them returning to the Philippines, or taking leave in Hong Kong, and being replaced by others. The nature of C—— and M——'s operations at that time was fluid, depending on the movement of troops and the progress of construction work on Guam. Respondents entered Guam shortly before or during the Korean War. Snack bars and other installations opened and closed as the need arose.

The special inquiry officer has stated that the best evidence of the capacity in which the respondents were employed, the purpose for which they were brought to Guam, ordinarily would be the official record of arrival, but here there was no such record so recourse must be had to such records as there were. Since respondents arrived during an era of impossible record keeping, the best evidence is the capacity in which they were actually employed either immediately or within a reasonable time after their arrival. The special inquiry officer quotes *Ex parte Kaichiro Sugimoto*, 33 F.2d 926, aff'd 38 F.2d 207, cert. den. 281 U.S. 745, and *Tulsidas* v. *Insular Collector of Customs*, 262 U.S. 258, that "It is his status at the time of entry, and not that subsequent to entry which controls." In *Tulsidas* and *Sugimoto* there is no indication how long after the aliens' arrivals as laborers that they changed their occupations and became a merchant and a restaurant keeper. However, the special inquiry officer has interpreted this rule most rigidly, declaring that if there was any lapse of time after an alien's arrival before he was put into a managerial or supervisory position he was not brought to Guam to be employed in such a position. The special inquiry officer found in several cases where the aliens were given temporary jobs until they were permanently assigned, that it was the temporary employment, no matter how brief, which governed the status in which they entered. He states (p. 37, special inquiry officer's decision), "If he arrived on Guam on April 3, 1951, for the purpose of being employed as a waiter, the fact that the *next day* he was assigned to work as a cashier would not have made him admissible on April 3, 1951." In *Tulsidas* and *Sugimoto* the changes were

| Y—K—L—*(Y—S—) 8-944-606 | C—F—W—(W—F—F—) 8-944-636 | A—M—T—*(T—T—) 8-944-635 | L—H—(H—L—) 8-944-626 | F—W—K—(K—F—) 8-944-603 | C—H— 8-944-625 |
|---|---|---|---|---|---|
| Nov. 1948 ·125. | Nov. 1948 —— 150. | Nov. 1948 —— 162.50 | | | |
| Dec. 1948 —— 150. | Dec. 1948 —— 155. | Dec. 1948 —— 102.50 | | | |
| Jan. 1949 Asst. Cook 150. | Jan. 1949 Asst. Cook 155. | Jan. 1949 Chief Baker 162.50 | | | |
| Feb. 1949 Cook 150. | Feb. 1949 Asst. Cook 155. | | | | |
| Mar. 1949 —— 150. | Mar. 1949 155. | | | | |
| Apr. 1949 —— 150. | Apr. 1949 155. | | | | |
| May 1949 —— 150. | | | | | |
| June 1949 —— 150. | | | June 1949 162.50 | | |
| July 1949 —— 150. | | July 1949 162.50 | July 1949 Chief Cook 162.50 | | |
| | Aug. 1949 (½ month) 155. | Aug. 1949 Baker 162.50 | Aug. 1949 162.50 | | |
| Sept. 1949 Cook 159. | Sept. 1949 155. | Sept. 1949 162.50 | Sept. 1949 Baker 27.08 (5 days) | | |
| Oct. 1949 —— 150. | Oct. 1949 Cook 158.88 | Oct. 1949 Baker 162.50 | Oct. 1949 162.50 | Oct. 1949 Cook 150. | |
| | | Nov. 1950 Chief Baker 120.42 (21 days) | Nov. 1950 Cook 171.13 2 pages | Nov. 1950 Cook 45.50 (7 days) | |
| | Dec. 1950 Chief Cook 162.75 | | Dec. 1950 Chief Baker 170.63 | | Dec. 1950 (½ month) Baker 63. |
| | Sept. 23, 1951 Empl. Contract Ch. Cook 167.63 | July 12, 1951 Empl. Contract Ch. Baker 175.75 | | Feb. 1951 Cook 150. | Feb. 1951 Baker 125. |
| | Oct. 1951 Chief Cook 167.63 | | | | Sept. 21, 1951 Empl. Contract Baker 150. |
| Jan. 16, 1952 Empl. Contract Ch. Cook 162.25 | | | Feb. 11, 1952 Empl. Contract Ch. Cook 175.75 | Nov. 22, 1951 Empl. Contract Ch. Cook 150. | Nov. 1951 Asst. Chief Baker |

*Proceedings terminated by special inquiry officer.

387

| C——Y—— / L——* / (L——C——) / 8-944-627 | L——A——* / (A——L——) / 8-944-604 | P——C——C— / (L——F——) / 8-944-633 | C——C—— / N—— / (N——Y——) / 8-944-611 | K——N—— / (N——K——) / 8-944-602 | L——W—— / P——Q—— / (L——S——) / 8-944-613 |
|---|---|---|---|---|---|
| | | Nov. 1950 Manager 110. | | | |
| | | Dec. 1950 Manager 110. | | | Dec. 1950 Cook 150. |
| | Mar. 1951 "in charge" 65. (25 days) | | Mar. 1951 "counter" temp. assign. 65. (26 days) | | |
| Apr. 1951 Manager 100. (2 pages) | | | | Apr. 1951 85. (28 days) | |
| May 1951 Manager 110. | | | | | |
| June 1951 Manager 135. | | | | | |
| Oct. 1951 Manager 150. | Oct. 1951 Manager 16.15 (5 days) | | Oct. 1951 Manager 116.87 | | |
| | Nov. 1951 Manager 126. | | | | |
| Jan. 6, 1952 Empl. Contract Manager 150. | Mar. 6, 1952 Empl. Contract Manager 125. | July 29, 1951 Empl. Contract Manager 115.50 | March 6, 1952 Empl. Contract Manager 170. | Apr. 3, 1952 Empl. Contract Manager 140. | May 26, 1952 Empl. Contract Ch. Cook 157.50 |

*Proceedings terminated by special inquiry officer.