# UNITED STATES *v.* LAWS.

CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 248. Submitted April 28, 1896.—Decided May 18, 1896.

A contract made with an alien in a foreign country to come to this country as a chemist on a sugar plantation in Louisiana, in pursuance of which contract such alien does come to this country and is employed on a sugar plantation in Louisiana, and his expenses paid by the defendant, is not such a contract to perform labor or service as is prohibited in the act of Congress passed February 26, 1885.

THE case is stated in the opinion.

*Mr. Solicitor General* for plaintiff in error.

*Mr. Lawrence Maxwell, Jr.,* for defendant in error.

MR. JUSTICE PECKHAM delivered the opinion of the court.

This case comes here upon a certificate from the United States Circuit Court of Appeals for the Sixth Circuit. The case came before that court by writ of error to the judgment of the Circuit Court of the United States for the Southern District of Ohio, Western Division. Upon being presented to the Circuit Court of Appeals it appeared from the record that the following question or proposition of law arose in the case concerning which the court desired the instruction of this court as to the proper decision thereof. The following is the question as stated:

"Is a contract made with an alien in a foreign country to come to this country as a chemist on a sugar plantation in Louisiana, in pursuance of which contract such alien does come to this country and is employed on a sugar plantation in Louisiana, and his expenses paid by the defendant, a contract to perform labor or service as prohibited in the act of Congress passed February 26, 1885?"

The court certified the following as being a summarized statement of the facts appearing in the bill of exceptions made under the direction of the judges of the court, viz.:

## "*Statement of Facts.*

"A. Seeliger was, on or about July 22, 1889, a citizen of the German Empire, residing at Dormangen, Germany. At that date it is claimed that the defendant made a contract with him to come to the United States as a chemist on a sugar plantation in Louisiana, and that Seeliger agreed to come to the United States for that purpose, and that the defendant paid his expenses to the United States; that Seeliger paid his expenses to the United States; that Seeliger came to the United States and went to Louisiana, and was there employed on a sugar plantation as chemist under the direction of the defendant."

It will be noticed that in the foregoing statement of facts there is a plain contradiction as to which party paid Seeliger's expenses; whether he paid them himself or whether the defendant paid them, it being stated both ways. This is unquestionably a mere clerical error, because in the question which

is certified to this court the statement is plainly made that the expenses of Seeliger were paid by the defendant. We must assume, therefore, that such is the fact.

The act of Congress under which the question arises, passed February 26, 1885, c. 164, 23 Stat. 332, is entitled "An act to prohibit the importation and migration of foreigners and aliens under contract or agreement to perform labor in the United States, its Territories and the District of Columbia." The first and second sections thereof read as follows:

"SEC. 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That from and after the passage of this act it shall be unlawful for any person, company, partnership or corporation, in any manner whatsoever, to prepay the transportation, or in any way assist or encourage the importation or migration of any alien or aliens, any foreigner or foreigners, into the United States, its Territories, or the District of Columbia, under contract or agreement, parol or special, express or implied, made previous to the importation or migration of such alien or aliens, foreigner or foreigners, to perform labor or service of any kind in the United States, its Territories, or the District of Columbia.

"SEC. 2. That all contracts or agreements, express or implied, parol or special, which may hereafter be made by and between any person, company, partnership or corporation, and any foreigner or foreigners, alien or aliens, to perform labor or service or having reference to the performance of labor or service by any person in the United States, its Territories or the District of Columbia previous to the migration or importation of the person or persons whose labor or service is contracted for into the United States, shall be utterly void and of no effect."

The third and fourth sections are not material here. The fifth section, after providing for certain exceptions to the provisions of the first two sections, further enacts that the act shall not apply "to professional actors, artists, lecturers or singers, nor to persons employed strictly as personal or domestic servants."

While this act was in force a suit was brought in the Circuit Court for the Southern District of New York in favor of the United States against the Rector, etc., of the Church of the Holy Trinity in the city of New York. It was brought to recover the penalty of $1000, as provided for in the act, and in the course of the trial it appeared that the defendant was a religious corporation, and had engaged a Mr. Warren, an alien residing in England, to come to the city of New York and take charge of its church as pastor. It was claimed on the part of the United States that the church corporation in making that contract with Mr. Warren had violated the first section of the act in question. It was held by the Circuit Court that the contract was within the statute, and that the defendant was liable for the penalty provided for therein. *United States* v. *Rector &c. of the Church of the Holy Trinity,* 36 Fed. Rep. 303.

In the course of his opinion the learned Circuit Judge said, p. 304:

"It was, no doubt, primarily the object of the act to prohibit the introduction of assisted immigrants, brought here under contracts previously made by corporations and capitalists to prepay their passage and obtain their services at low wages for limited periods of time. It was a measure introduced and advocated by the trades union and labor associations, designed to shield the interests represented by such organizations from the effects of the competition in the labor market of foreigners brought here under contracts having a tendency to stimulate immigration and reduce the rates of wages. Except from the language of the statute there is no reason to suppose a contract like the present to be within the evils which the law was designed to suppress; and, indeed, it would not be indulging a violent supposition to assume that no legislative body in this country would have advisedly enacted a law framed so as to cover a case like the present."

Nevertheless the Circuit Court felt bound by what it regarded the plain terms of the statute to hold that the defendant had violated the act and was therefore amenable to its penalties.

The court was strengthened in its construction of the statute in question by the terms of the proviso above alluded to, contained in the fifth section, which excepted from the act professional actors, artists, lecturers and singers. The Circuit Judge said: "If, without this exemption, the act would apply to this class of persons, because such persons come here under contracts for labor or service, then clearly it must apply to ministers, lawyers, surgeons, architects and all others who labor in any professional calling. Unless Congress supposed the act to apply to the excepted classes, there was no necessity for the proviso. . . . Giving effect to this well settled rule of statutory interpretation the proviso is equivalent to a declaration that contracts to perform professional services, except those of actors, artists, lecturers or singers, are within the prohibition of the preceding sections." (page 305.)

The defendant in the action brought the case to this court for review, where the judgment of the Circuit Court was reversed, and it was held that the statute did not apply to such a contract. The opinion of this court was delivered by Mr. Justice Brewer, and is reported in 143 U. S. 457. In the course of that opinion the title of the act in question was referred to and commented upon, and it was stated, in speaking of the title, that "obviously the thought expressed in this reaches only to the work of the manual laborer as distinguished from that of the professional man. No one reading such a title would suppose that Congress had in its mind any purpose of staying the coming into this country of ministers of the gospel, or, indeed, of any class whose toil is that of the brain."

It was further stated in the opinion as follows:

"Again, another guide to the meaning of a statute is found in the evil which it is designed to remedy; and for this the court properly looks at contemporaneous events, the situation as it existed, and as it was pressed upon the attention of the legislative body. *United States* v. *Union Pacific Railroad*, 91 U. S. 72, 79. The situation which called for this statute was briefly but fully stated by Mr. Justice Brown when, as District Judge, he decided the case of *United States* v. *Craig*, 28 Fed. Rep. 795, 798: 'The motives and history of the act

are matters of common knowledge. It had become the practice for large capitalists in this country to contract with their agents abroad for the shipment of great numbers of an ignorant and servile class of foreign laborers, under contracts, by which the employer agreed, upon the one hand, to prepay their passage, while, upon the other hand, the laborers agreed to work after their arrival for a certain time at a low rate of wages. The effect of this was to break down the labor market, and to reduce other laborers engaged in like occupations to the level of the assisted immigrant. The evil finally became so flagrant that an appeal was made to Congress for relief by the passage of the act in question, the design of which was to raise the standard of foreign immigrants, and to discountenance the migration of those who had not sufficient means in their own hands, or those of their friends, to pay their passage.' "

Allusion is then made to the petitions and testimony presented before the committees of Congress, from which it appears " that it was this cheap, unskilled labor which was making the trouble, and the influx of which Congress sought to prevent. It was never suggested that we had in this country a surplus of brain toilers, and, least of all, that the market for the services of Christian ministers was depressed by foreign competition."

Summing up the matter on this branch, it was said in the opinion as follows: " We find, therefore, that the title of the act, the evil which was intended to be remedied, the circumstances surrounding the appeal to Congress, the reports of the committee of each house, all concur in affirming that the intent of Congress was simply to stay the influx of this cheap, unskilled labor."

Beyond that, the opinion proceeded with the statement that no purpose of action against religion could be imputed to any legislation, state or national, because of the fact that this is a religious people, not Christianity with an established church and tithes and spiritual courts; but Christianity with liberty of conscience to all men, as was stated in *Updegraph* v. *The Commonwealth*, 11 S. & R. 394, 400.

Upon the basis, therefore, that it could not be imputed as the intention of Congress, notwithstanding the language used in the act, to prevent the introduction of religious teachers, it was held that the act did not apply to the case before the court. Both grounds were covered in the opinion; the one that the act was clearly intended to apply only to cheap, unskilled labor, and the other that in no event could it be construed as applying to a contract for the services of a rector or a pastor of a religious corporation. The first ground covers the case in hand. The construction given to the words "labor or service" by this court in the above case was neither forced, unnatural nor unusual. Considering the clear purpose of the act, the construction adopted was a natural and proper one.

The same construction has been adopted in the courts in the State of New York in relation to statutes providing for claims of laborers. In *Ericsson* v. *Brown*, 38 Barb. 390, one of the sections of the act of incorporation rendered the stockholders individually liable for all the debts due and owing by the company to its "laborers and apprentices." The plaintiff, being a consulting engineer, rendered services to the company as such, and he was held not to be within the meaning of the statute, and hence could not recover from a stockholder. The statute was held to refer to unskilled labor, where the individual earned his wages more by the labor of his hands than of his head.

In *Aikin* v. *Wasson*, 24 N. Y. 482, the plaintiff contracted with a railroad company to construct part of its road. Defendant was a stockholder in the company, which became insolvent. It was indebted to plaintiff for the services of himself and his laborers and servants under his contract. Section 10 of the railroad act enacted that "all the stockholders of every such company shall be jointly and severally liable for all the debts due or owing to any of its laborers and servants for services performed for such corporation." It was held that the plaintiff was neither a laborer nor a servant within the meaning of the act.

In *Coffin* v. *Reynolds*, 37 N. Y. 640, the statute read: "The stockholders of a company organized under the provisions of

this act shall be jointly and severally individually liable for all debts that may be due and owing to all their laborers, servants and apprentices for services performed for such corporation." The plaintiff was the secretary of the company and commenced an action against the defendant as a stockholder to recover the amount of his salary, the company being insolvent. It was held that he could not recover. He was not a laborer or a servant within the meaning of the statute.

In *Wakefield* v. *Fargo*, 90 N. Y. 213, under the same statute it was held that one who was employed at a yearly salary as book-keeper and general manager was not a laborer, servant or apprentice within the meaning of the act, and hence that he could not recover against the stockholders for a balance of salary due him from the insolvent corporation.

These statutes were passed for the protection of laborers, servants, apprentices and the like, and the opinions of the courts in relation to the class of individuals that would be included within the meaning of those terms are somewhat relevant although not entirely analogous to the case before this court.

Congress, however, a short time after and probably in consequence of the decision of the Circuit Court in the Southern District of New York, amended the fifth section of the statute in question by adding to the proviso therein mentioned the words "nor to ministers of any religious denomination, nor persons belonging to any recognized profession, nor professors for colleges and seminaries," so that the proviso would read that the provisions of this act should not "apply to professional actors, artists, lecturers or singers, nor to persons employed strictly as personal or domestic servants, nor to ministers of any religious denomination, nor to persons belonging to any recognized profession, nor professors for colleges and seminaries." Act of March 3, 1891, c. 551, 26 Stat. 1084.

This amendment to the statute of 1885, although passed subsequently to the decision in the Circuit Court and prior to the decision of the same case in this court, was not mentioned in the opinion in this court, because the review was had upon the record based upon the act as originally passed in 1885.

If by the terms of the original act the provisions thereof applied only to unskilled laborers whose presence simply tended to degrade American labor, the meaning of the act as amended by the act of 1891 becomes if possible still plainer. Now by its very terms it is not intended to apply to any person belonging to any recognized profession. We think a chemist would be included in that class. Although the study of chemistry is the study of a science, yet a chemist who occupies himself in the practical use of his knowledge of chemistry as his services may be demanded may certainly at this time be fairly regarded as in the practice of a profession. One definition of a profession is an "employment, especially an employment requiring a learned education, as those of divinity, law and physic." (Worcester's Dictionary, title profession.) In the Century Dictionary the definition of the word "profession" is given, among others, as "A vocation in which a professed knowledge of some department of science or learning is used by its practical application to the affairs of others, either in advising, guiding, or teaching them, or in serving their interests or welfare in the practice of an art founded on it. Formerly, theology, law, and medicine were specifically known as *the professions;* but as the applications of science and learning are extended to other departments of affairs, other vocations also receive the name. The word implies professed attainments in special knowledge as distinguished from mere skill. A practical dealing with affairs as distinguished from mere study or investigation; and an application of such knowledge to uses for others as a vocation, as distinguished from its pursuit for its own purposes." There are professors of chemistry in all the chief colleges of the country. It is a science the knowledge of which is to be acquired only after patient study and application. The chemist who places his knowledge acquired from a study of the science to the use of others as he may be employed by them, and as a vocation for the purpose of his own maintenance, must certainly be regarded as one engaged in the practice of a profession which is generally recognized in this country.

The question presented to us assumes that the individual is

a chemist, and that he has come to this country for the purpose of pursuing his vocation as a chemist on a sugar plantation in Louisiana. It may be assumed that the branch of chemistry which he will practice will be that which relates to and is connected with the proper manufacture of sugar from the sugar cane, or possibly from sorghum or beets. He is none the less a chemist, and none the less occupied in the practice of his profession because he thus limits himself to that particular branch, which is to be applied in the course of the scientific manufacture of sugar any more than a lawyer would cease to practice his profession by limiting himself to any particular branch thereof or a doctor by confining his practice to some speciality which he particularly favored and was eminent in.

It is not stated what the particular duties of a chemist on a sugar plantation are, but it is quite plain, even to one not engaged in the business, that there would be a necessity for the services of one skilled in the science of chemistry in order to enable a manufacturer to make the most out of his materials and produce a commodity up to the proper standard and of a marketable nature. All sugar cane, for example, is not alike in quality or in the proportions of the ingredients which enter into its composition, and in the course of manufacture these differences must be discovered and determined, and the material must be treated accordingly so that the finished product shall be a commodity which is up to the standand set with reference to the particular grade of sugar which it is claimed to be. In order to determine this difference and to reach this standard, analyses of the different samples of the cane at some period of the process of manufacture ought to and must be made, and these analyses it is the province of a chemist to make. Upon their results depend the future treatment of the article. The samples analyzed will of course differ, to some extent, in their qualities from each other, and each will require different treatment, depending upon the result of the analysis and the directions of the chemist founded thereon. There can be, therefore, no regular or formal rule or method adopted for all cases. It becomes necessary to examine each

sample and decide after such examination what treatment is necessary for that particular lot thus examined. Learning in the science, skill in its practice, experience in results, are all factors going to make up the competent chemist in this particular branch.

The fact that the individual in question, by this contract, had agreed to sell his time, labor and skill to one employer, and in one prescribed branch of the science, does not in the least militate against his being a professional chemist, nor does it operate as a bar to the claim that while so employed he is nevertheless practising a recognized profession. It is not necessary that he should offer his services to the public at large nor that he should hold himself ready to apply his scientific knowledge and skill to the business of all persons who applied for them before he would be entitled to claim that he belonged to and was actually practising a recognized profession. As well might it be said that the lawyer who enters into the service of a corporation and limits his practice to cases in which the corporation is interested thereby ceases to belong to the profession. The chemist may confine his services to one employer so long as the services which he performs are of a professional nature. It is not the fact that the chemist keeps his services open for employment by the public generally which is the criterion by which to determine whether or not he still belongs to or is practising a recognized profession. So long as he is engaged in the practical application of his knowledge of the science, as a vocation, it is not important whether he holds himself out as ready to make that application in behalf of all persons who desire it, or that he contracts to do it for some particular employer and at some named place.

We have no doubt that the individual named comes within one of the exceptions named in the statute.

*The question certified to this court by the Circuit Court of Appeals for the Sixth Circuit should be answered in the negative.*