## Ex parte AIRD.

### (District Court, E. D. Pennsylvania. December 15, 1921.)

### No. 8626.

**1. Aliens ⬥50—Immigration statute; "labor" means manual labor.**

In Immigration Act Feb. 5, 1917, § 3 (Comp. St. 1918. Comp. St. Ann. Supp. 1919, § 4289¼b), excluding aliens coming to the United States under contract, agreement or inducement "to perform labor in this country of any kind, skilled or unskilled," the word "labor" is to be construed in its generally understood meaning as applying to manual labor.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Labor.]

**2. Aliens ⬥50—Designer of marine machinery held to belong to a "learned profession."**

An alien educated in a technical school as a marine engineer and trained and experienced in the designing of marine steam turbines who was induced to come to the United States to enter the employment of a shipbuilding company, where he was made a "class A draftsman," whose duty it was to design machinery for vessels to conform to general plans and specifications for the particular vessel, and to direct the work of draftsmen under him, *held* a person "belonging to a recognized learned profession" within the exception in Immigration Act Feb. 5, 1917, § 3 (Comp St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b), and not subject to deportation as a contract laborer.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Learned Profession.]

**3. Words and Phrases—"Draftsmen" defined.**

The term "draftsmen" in the marine engineering profession is used to specify a man who designs the various parts of vessels and other machinery in the different departments.

Habeas Corpus. On petition of David M. Aird for writ to secure discharge from custody under deportation warrant. Granted.

George Wharton Pepper, of Philadelphia, Pa., and Cravath, Henderson, Leffingwell & De Gersdorff, of New York City, for plaintiff.

Truman D. Wade, Asst. U. S. Atty., of West Chester, Pa., and George W. Coles, U. S. Atty., of Philadelphia, Pa., for defendant.

THOMPSON, District Judge. The relator was arrested and is being held for deportation under a warrant issued by the Assistant Secretary of Labor upon the ground that, from proofs submitted after due hearing before an immigrant inspector, the Assistant Secretary became satisfied that, having landed in the United States on April 22, 1920, he has been found here in violation of Immigration Act Feb. 5, 1917, § 3 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b), to wit:

"That he was a contract laborer at the time of his entry, having been induced, assisted, encouraged, or solicited to migrate to this country by an offer or promise of employment, or in consequence of an agreement, oral, written, or printed, express or implied, to perform labor of any kind, skilled or unskilled, in the United States."

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

From the record of the hearing before the immigrant inspector and the testimony taken at the hearing upon the writ of habeas corpus the undisputed facts are found to be as follows:

The relator is a British subject and was born at Edderton, Scotland, in May, 1888. He was educated in the public schools and the Tain Royal Academy, where his course of study included English, Latin, French, mathematics, physics, chemistry, and machine drawing. At the age of 17 he entered the Glasgow Technical College and covered whatever was necessary to obtain certificates of proficiency in various engineering subjects required to qualify him as a marine engineer. While attending Glasgow Technical College, he served four years in the shops as an apprentice engineer and in the drafting office during the last year.

Having obtained a certificate of proficiency in the various engineering subjects, he taught engineering at a high school. Prior to coming to the United States he was employed by shipbuilding and engineering companies, where his work was in designing marine steam turbines. The method of work was as follows: His superintendent would inform him of the size and type of vessel for which an engine was needed as well as the approximate size of the engine to be installed, and his duty consisted in planning and designing so as to combine most satisfactorily economy in cost and efficiency in operation; the details of construction and arrangement of engines being left entirely to him.

During 1920 Aird learned that men of his qualifications were needed by the Bethlehem Shipbuilding Corporation at Bethlehem, Pa., and communicated with one Capt. Smith, the London representative of that concern. He was informed that there were openings for men of his class at Bethlehem and that he could probably obtain employment. Aird informed Capt. Smith that he had decided to go to the United States to seek employment with the Bethlehem Shipbuilding Company, and his fare was paid by Capt. Smith.

On arriving in the United States, he went at once to Bethlehem and was given employment as a "class A draftsman." His duties were substantially similar to those performed by him in Scotland.

It is apparent that Aird was induced, assisted, encouraged, and solicited to migrate to this country by an offer of employment. The first question is whether he came here to perform either skilled or unskilled labor within the intent of the law, and, if that is answered in the affirmative, whether he was outside of the classification of contract labor by reason of belonging to a recognized learned profession.

The rightful exclusion of the relator from the United States depends, not upon his qualifications for performing certain kind of employment, but upon the kind of employment he was induced, assisted, encouraged, or solicited to migrate to this country to perform, under an offer or promise of employment. It is apparent from the evidence in the case that he came here to get work of the sort which he actually did obtain —that is, as a "class A draftsman." In the finding of the immigrant inspector, he quotes from section XVII of the agreement for classifying salaries, known as the "Macey award," as follows:

"Draftsmen, Grade A. Man laying out and developing work completely from specifications. Must have had two years' experience as draftsman in grade B, or five years drafting or equivalent experience outside of a shipyard, or be a graduate of a technical college in the course of engineering or architecture and in addition have one year's experience in a shipyard."

The department of the Bethlehem Shipbuilding Corporation. in which the relator was employed, is headed by a technical manager under whom are an assistant technical manager, a chief naval architect, and a chief engineer. Under the chief naval architect are three assistants, one in charge of government work, one in charge of merchant work, and one special assistant in charge of electrical work. Under these respective architects and engineers are chief draftsmen known as "class A draftsmen," of whom the relator was one.

[3] The term "draftsmen" in the marine engineering profession is used to specify a man who designs the various parts of vessels and other machinery in the different departments. Under the chief, or class A, draftsmen are class B and class C draftsmen. In arranging the drafting force, the engineering department is governed by the man's education and experience; the holding of a degree having little bearing. The Technical College of Glasgow, from which the relator holds his certificates, is the recognized and foremost technical college in Scotland, and has a high standing among the technical colleges of the world.

There is no standard type of plans and specifications for marine vessels. After ascertaining from the proposed owner the tonnage, the nature of the trade, or the purpose for which the vessel is to be used, specifications are developed to meet its requirements, and there is designed a general arrangement showing the profile, the midship section, the arrangement of the decks, and the accommodations for the location of the machinery and other equipment. The technical manager, the naval architect, and the chief engineer supervise this work as it is being developed, but the actual work of designing is done by the chief draftsmen under respective superiors, they in turn directing the draftsmen working under them. In case the vessel is ordered, this general plan with the specifications showing the character of construction is then distributed to the engineering force of the various departments to originate and carry out the details of the plan. This whole work is done in the engineering division. What is done by a draftsman of the type of the relator is described in the testimony of the witness Hendry, sales agent, and former assistant to the technical manager of the Bethlehem Shipbuilding Corporation as follows:

"Q. For instance, if, in the distribution of the work, the creation of a certain unit to fit into the scheme is allotted to a man of Aird's type, what does he do? A. He has got to go on his own experience and his own original thought of what is going to be the best type of design of machine, or whatever the piece of apparatus is, that will give the results required in that particular piece of mechanism.

"Q. When he has reached his conclusion, based upon his experience and the use of his ingenuity and creative abilities, what does he do? Does he make a plan of the unit? A. Yes. He may not make the completed plan in itself, but he will design, he will outline. what is to be done and he may turn over to a junior the thing simply to develop and trace so we can make

blueprints, but men of Aird's character have to design these various parts, and it is no mere repetition of something that has gone before. It is an intelligent application of engineering formula and a matter of experience and original thought that is called for."

In construing the earlier contract labor law of 1885 in the case of Holy Trinity Church v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226, the circuit court had held that, giving effect to the well-settled rule of statutory interpretation, the proviso (excepting actors, artists, lecturers, singers, and domestic servants) is equivalent to a declaration that contracts to perform professional services except those of actors, artists, lecturers, singers, or domestic servants are within the prohibition of the preceding section.

The Supreme Court, reversing the circuit court, held, in view of the title of the act, the evils to be remedied, and the apparent intention of Congress, that the act applied only to the work of the manual laborer as distinguished from that of the professional man; that Congress had in its mind no purpose of staying the coming into this country of ministers of the gospel or indeed of any class whose toil is that of the brain.

In the case of the United States v. Laws, 163 U. S. 258, 16 Sup. Ct. 998, 41 L. Ed. 151, section 5 of the act of 1885 (23 Stat. 333) had been amended by Act March 3, 1891, § 5 (26 Stat. 1085) adding to the exempted class "persons belonging to any recognized profession," and the Supreme Court held that a chemist who had come to this country to act as superintendent on a sugar plantation was a member of a recognized profession.

[1] The acts of 1907 (34 Stat. 898, § 2) and 1917, the latter of which is involved here, differ in part from the former acts in that the words "labor in this country of any kind, skilled or unskilled," are substituted for the words "labor or service of any kind." "Labor or service of any kind" is apparently broader in its significance than "labor of any kind, skilled or unskilled." Whether skilled or unskilled, it is still the performance of labor which the act includes within the agreements or contracts for employment which may debar a person from landing. There is nothing in the act to indicate a change of the purpose of the legislation from that declared by the Supreme Court in Scharrenberg v. Dollar S. S. Co., 245 U. S. 122, 38 Sup. Ct. 28, 62 L. Ed. 189, to have been adopted in the Holy Trinity Church Case, namely, "to arrest the bringing of an ignorant, servile class of foreign laborers into the United States, under contract to work at a low rate of wages, and thus reduce other laborers engaged in like occupations to the level of the assisted immigrant."

I think the Scharrenberg Case disposes of the construction adopted by the District Court in Ex parte Kunijiro Toguchi, 238 Fed. 632, and this was the conclusion of the Circuit Court of Appeals of the Second Circuit in an opinion by Judge Ward in the case of United States v. Union Bank of Canada (C. C. A.) 262 Fed. 91, 8 A. L. R. 1438.

That the words "laborer" or "labor" have a generally adopted, accepted meaning as applying to manual labor is shown by the cases collected through the industry of counsel for the relator, and cited in his

brief: Teeithdass v. Pohoomul Bros., 13 Philippine Reports, 605; Galveston, Houston & San Antonio Ry. Co. v. Berry, 31 Tex. Civ. App. 408, 72 S. W. 1049; Wakefield v. Fargo, 90 N. Y. 213; Leinau v. Albright, 10 Pa. County Ct. R. 171; Ericsson v. Brown, 38 Barb. (N. Y.) 390.

[2] It is clear that the relator, in the employment he entered this country to perform, was not engaged in labor, skilled or unskilled, within the accepted meaning of those words. He was a "brain toiler"; his work required technical training, skill, and learning in various branches of science. What he did, he did not perform with his hands or merely as a skilled mechanic would through application of mere mechanical skill. His employment, in designing marine turbine engines or auxiliary machinery connected with them, is one in which the planning and working out of the details must be originated in the mind of the designer. The court says in U. S. v. Laws, supra: ·

"One definition of a profession is an 'employment, especially an employment requiring a learned education, as those of divinity, law and physic.' Worcester's Dictionary, title Profession. In the Century Dictionary the definition of the word 'profession' is given, among others, as 'a vocation in which a professed knowledge of some department of science or learning is used by its practical application to the affairs of others, either in advising, guiding, or teaching them, or in serving their interests or welfare in the practice of an art founded on it. Formerly, theology, law, and medicine were specifically known as the professions; but as the applications of science and learning are extended to other departments of affairs, other vocations also receive the name. The word implies professed attainments in special knowledge as distinguished from mere skill. A practical dealing with affairs as distinguished from mere study or investigation; and an application of such knowledge to uses for others as a vocation, as distinguished from its pursuit for its own purposes.' "

Notwithstanding his designation as a draftsman, the relator, as a class A draftsman in the Bethlehem Shipbuilding Corporation, possessed and was required to apply learning and skill in marine engineering, and thus comes within the special exemption to persons belonging to a recognized learned profession. He should be discharged upon either ground.

It is ordered that he be discharged.