MATTER OF SHAW

In Visa Petition Proceedings

NYC-N-17649

Decided by District Director May 28, 1965

Since the term "of distinguished merit and ability" implies preeminence in the field of endeavor, nonimmigrant classification under section 101(a)(15)(H) (i), Immigration and Nationality Act, for a singer-performer for a television show, is denied an 18-year-old beneficiary who was unknown as a performer a year ago; who has no record of extensive performances; whose recording successes are few in number; while one of her recordings has reached the pinnacle of success in Great Britain, their popularity has been strictly ephemeral; the supporting documentation, consisting of 26 clippings from publications, is essentially biographical, offering virtually no critical appraisal of her performances or talents; the proposed salary for the work involved, which does not include transportation and incidental expenses, would scarcely defray first-class transportation; and, in addition, an advisory opinion of the American Federation of Television and Radio Artists concludes the beneficiary falls far short of being of distinguished merit and ability.

A petition by Sullivan Productions, Incorporated, 524 West 57th Street, New York, New York, was submitted on May 19, 1965, to accord Sandie Shaw, an 18-year-old native and citizen of Great Britain, classification under section 101(a)(15)(H)(i) of the Immigration and Nationality Act. The services of the beneficiary are sought as a singer-performer for the Al Hirt Television Show.

The provisions of sections 101(a)(15)(H)(i) and 101(a)(15)(H) (ii) of the Act, which are applicable and to which reference will be made, are quoted below:

Section 101(a)(15)—the term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens—

(H) an alien having a residence in a foreign country which he has no intention of abandoning (i) who is of distinguished merit and ability and who is coming temporarily to the United States to perform temporary services of an exceptional nature requiring such merit and ability; or (ii) who is coming temporarily to the United States to perform other temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country.

A prior petition to accord the beneficiary classification under section 101(a)(15)(H)(i) of the Act was submitted by the Hullabaloo Company, New York, New York, on March 26, 1965. Her services were sought as a performer to sing popular British songs on the Hullabaloo Television Show. The beneficiary was to receive $1500 for one performance.

The documentation submitted in support of the earlier petition included a letter by Mike Maitland of Warner Brothers Records, Incorporated, Burbank, California, stating the beneficiary is destined to become an important record artist in the United States, and statements by the General News Editor of *Music Business* magazine and the Music Editor of *Billboard* magazine indicating the beneficiary to be among the top English recording stars and a singer and performer of distinguished merit and exceptional ability. Also furnished were various record popularity tables. During the week ending October 31, 1964, the beneficiary's recording of "Always Something There to Remind Me" was in the number one position in Great Britain. An article appearing in the London *Daily Mail* of October 23, 1964, was submitted indicating the beneficiary to have been awarded a silver disc to commemorate the sucesss of this recording.

It is the policy of this Service, in the course of processing petitions of this nature, to request relating organizations and associations or outstanding individuals in their respective fields to provide advisory opinions regarding the qualifications, skills, or talents of the various beneficiaries. The Assistant Executive Secretary of the American Federation of Television and Radio Artists informed this office on April 7, 1965, that, in his opinion, the beneficiary is not a distinguished performer. He also advised that the services to be performed did not appear to be exceptional in nature and further asserted that her recordings were neither exceptional nor outstanding.

While the desires of unions to ban or limit the employment of foreign entertainers utilized to the detriment of unemployed American performers is appreciated, the opinions of such organizations must be given some weight because of their pertinency in matters involving an assessment of the merit and availability of performers in areas in which they are of necessity experienced and knowledgeable.

It was concluded that the evidence of record failed to establish that the beneficiary is a person of distinguished merit and ability within the contemplation of section 101(a)(15)(H)(i) of the Immigration and Nationality Act. On April 7, 1965, accordingly, the petition by the Hullabaloo Company in behalf of Miss Shaw was denied.

A petition to accord Miss Shaw classification under section 101(a)(15)(H)(ii) of the Act was submitted on May 24, 1965, by Puritan

Fashions, Incorporated, New York, New York. Her services as a character singer are needed by that organization to perform "rock and roll" songs at a private showing of English fashions on June 2, 1965, in New York City. The petitioner desires to utilize the services of Miss Shaw because she is well known in the field of fashion and associated with a certain style of clothing. A "Sandie Shaw" line of dresses will be introduced at the showing. The beneficiary is to receive a salary of $1000 for one evening's work. A clearance order from the Bureau of Employment Security certifying that qualified workers are not available for referral to the employer was submitted. The petition was approved on May 24, 1965.

Sullivan Productions, Incorporated, desires the services of Miss Shaw as a singer and performer for a three-day period, including rehearsals. The salary to be received by the beneficiary is $750. She will not receive additional remuneration to cover travel costs or incidental expenses. The videotape is slated to be recorded on June 2, 1965, and aired on August 7, 1965.

Twenty-six clippings were submitted in support of the instant petition. This material consists of items pertaining to the beneficiary, ranging from very brief notices of performance to feature-length articles. Almost all are from British publications. Many of the clippings are minutia or essentially biographical items offering so little specific information with respect to the beneficiary's performances or serious critical appraisal of her talents as to be virtually immaterial. Such items, devoted primarily to accounts of interviews held with the beneficiary and stories of how she entered the entertainment field, merely tend to establish a certain degree of popularity or notoriety. Other items pertain to the beneficiary's success as a recording artist and are similar to those submitted by the Hullabaloo Company. One of Miss Shaw's recordings is again seen to have occupied the number one position in British record rating charts for a brief period in October 1964. Since that time, she has made only a small number of recordings and although they have had a measure of success, none has been rated at or near the number one position. Charts based upon United States sales do not indicate that any of the beneficiary's recordings ever placed near the "top ten."

The clippings are generally vague and do not offer any substantive information pertaining to the beneficiary's experience as a performing artist. There are no concert reviews. No evidence is contained therein relating to any professional education or training she may have had. Many items relate to the beneficiary's rather unique style of performing barefooted. The *Bournemouth Times* of March 5,

1965, states: "Intriguing as her voice is, it's her feet that have also helped her gain recognition."

On May 20, 1965, the American Federation of Television and Radio Artists was informed of the current petition, appraised of the nature of the supporting documentation, and requested to furnish an advisory opinion as to whether the beneficiary may be considered a performer of distinguished merit and ability. An opinion was also solicited as to whether the duties to be performed require such a person. A letter dated May 26, 1965, from the Assistant Executive Secretary of that organization was received which concludes that the beneficiary falls far short of being of distinguished merit and ability as those terms are usually defined. The letter states that her songs were never very popular in the United States but omits mention of their popularity abroad. There is no opinion as to whether or not the duties to be performed are exceptional in nature. This Service does not dispute that at least one of the beneficiary's songs was, indeed, a "hit" abroad.

It is held that the term "distinguished merit and ability" implies a degree of skill and recognition substantially above that ordinarily encountered, to the extent that a person so described is preeminent in his field of endeavor. This Service is charged with the responsibility of determining whether or not a beneficiary meets this statutory requirement. On the other hand, the burden of proving that an entertainer possesses the necessary distinguished merit and ability and is to perform services of an exceptional nature, as required by law, rests upon the person or organization desiring to bring the alien to the United States. It is recognized that such determinations often lead to controversy—professional concert and drama critics and book reviewers are seldom in total agreement. Very often completely divergent opinions pertaining to the same event are authored by the "experts." Among the criteria which may be applied in assessing such intangibles as "distinguished merit and ability" are expert opinions, including critical reviews, popularity, box office appeal, sales of records, and contractual arrangements, including remuneration. While it is appreciated that sometimes the Service's decision is not accepted without some disagreement by the parties affected, it must be borne in mind that the issue involved is one where reasonable men can differ in judgement.

The evidence of record shows that barely one year ago the beneficiary was unknown as a performer. The praises and accolades contained in the clippings are not significantly different from those used to describe any vocalist with a modest amount of success. There is no record of extensive performance as she is in the relative infancy of

her career. The beneficiary's recording successes are few in number and cannot yet be considered to establish a degree of skill setting her apart from the many others who have attained similar renown. While one of her songs has reached the pinnacle of success in Britain, their popularity has been strictly ephemeral, as is characteristic of most songs, and even performers, in this idiom. The May 21, 1965 issue of *Time* magazine, for example, includes a very comprehensive survey of the "rock and roll" situation. Apropos of the short-lived popularity of performers in this field is the following quotation from this article: "Jan and Dean ('rock and roll' singers) have endured at least until next week, which is unique in a market where one-hit-and-forever-miss performances are the rule rather than the exception." The evidence considered in toto falls short of establishing that she has the "distinguished merit and ability" contemplated by the statute.

It is noted, moreover, that a star of the caliber contemplated by this section of the statute would ordinarily be expected to receive a much higher salary than the $750 offered the beneficiary, for the amount of work involved. This is especially the case when transportation and incidental expenses are not included. Even if the beneficiary were to travel "economy" class, the cost of transportation alone would amount to almost $500, leaving barely $250 as her stipend. First class transportation would virtually exhaust her proposed salary. The petitioning organization may not realistically be expected to be able to secure the services of a performer of "distinguished merit and ability" at the salary offered.

It has been concluded that the petitioner has not satisfactorily borne the burdens imposed by the statute of establishing either that the beneficiary is a person of distinguished merit and ability in her field or that the duties to be performed are exceptional in nature requiring such a person. For these reasons the petition will be denied. This action is taken without prejudice towards the consideration of a further petition by Sullivan Productions, Incorporated, to have this beneficiary accorded classification under section 101(a)(15)(H)(ii) of the Act. Such a petition would have to be accompanied by the requisite clearance order from the Bureau of Employment Security and regulatory fee.

**ORDER:** It is ordered that the petition of Sullivan Productions, Incorporated, to have Sandra Goodrich, professionally known as Sandie Shaw, accorded classification under section 101(a)(15)(H)(i) of the Immigration and Nationality Act, be and the same is hereby denied.