**HIRD/BLAKER CORPORATION, Chye–Ong Lim, Plaintiffs,**

v.

**Charles C. SAVA, District Director, Immigration and Naturalization Service, Defendant.**

No. 88 Civ. 5976 (RWS).

United States District Court, S.D. New York.

May 9, 1989.

---

S. Bernard Schwarz, New York City, for plaintiffs.

Benito Romano, U.S. Atty., S.D.N.Y., New York City (Timothy MacFall, Sp. Asst. U.S. Atty., of counsel), for defendant.

## AMENDED OPINION

SWEET, District Judge.

Plaintiffs Hird/Blaker Corporation ("Hird/Blaker") and Chye–Ong Lim ("Lim") have moved for summary judgment reversing the ruling of Charles C. Sava ("Sava"), District Director for the Immigration and Naturalization Service ("INS"), denying Hird/Blaker's application to obtain a temporary employment visa for Lim. Sava has moved under Rule 12(c), Fed.R.Civ.P., for judgment on the pleadings dismissing the complaint. For the reasons set forth below, the INS's ruling is remanded for further consideration consistent with this opinion.

*The Facts*

Lim is a Malaysian national who currently resides in Flushing, New York. Lim holds a Technician in Civil Engineering degree from the Ungku Omar Polytechnic Institute in Malaysia and a Bachelor of

Science degree with a major in civil engineering from Oklahoma State University. Before coming to the United States, Lim worked for three years on civil engineering projects in Kuala Lumpur and Langkawi Island, Malaysia.

Hird/Blaker is a custom architectural woodworking manufacturer and installer that specializes in large projects involving wall panelling, doors, floors, counters, cabinets, benches, and partitions. The firm employs some 100 employees and had gross sales for 1986 amounting to $5.2 million.

In 1987, a temporary three-year position as architectural cost estimator opened at Hird/Blaker, and the firm offered Lim the job at an annual salary of $21,000. The position involved preparing cost estimates for manufacturing products and construction projects, as well as providing services to help management bid on or determine the price of products or services the company provides. These duties required the architectural cost estimator to compile lists of materials, tools, fixtures, and equipment by analyzing blueprints and specifications and by applying his knowledge of the manufacturing process, services to be performed, and structures to be built. The value of some of the projects Hird/Blaker bids on at times approaches one million dollars.

On October 29, 1987, Hird/Blaker petitioned the INS to classify Lim as a nonimmigrant temporary worker pursuant to section 101(a)(15)(H)(i) of the Immigration and Nationality Act (the "Act"), 8 U.S.C. § 1101(a)(15)(H)(i), thereby qualifying Lim for a nonimmigrant H–1 visa under section 214(c) of the Act, 8 U.S.C. § 1184(c). Section 101(a)(15)(H)(i) provides that the INS may classify as a nonimmigrant any alien who:

 having a residence in a foreign country which he has no intention of abandoning ... is of distinguished merit and ability and who is coming temporarily to the United States to perform services of an exceptional nature requiring such merit and ability....

Hird/Blaker stated in its petition that the architectural cost estimator position required a person holding an engineering degree and that the firm had always used an engineer for that job.

On November 5, 1987, the INS advised Hird/Blaker that its petition had failed to establish that the architectural cost estimator position necessarily required an applicant with an engineering degree and directed the firm to resubmit the petition with additional documentation. In response, Hird/Blaker on December 15, 1987 provided the INS a letter describing its requirements for an architectural cost estimator, an architect's affidavit, and excerpts from two Department of Labor publications, the *Dictionary of Occupational Titles* ("DOT") and *Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles.*

On January 12, 1988, the INS denied Hird/Blaker's petition, finding that the firm had failed to establish that the architectural cost estimator position required a person of distinguished merit and ability. The ruling stated in pertinent part:

> You are seeking the services of the beneficiary to be a cost estimator. You contend that the position requires a civil engineering degree. The duties described are those similar to the duties of a construction contractor. Reading of blue prints and cost estimation in the construction industry has been learned by apprenticeship and on the job training. Your assertion that the position requires a baccalaureate is not accompanied by evidence that a degree in civil engineering is a realistic requirement for the specific position that you are offering the beneficiary.

On January 25, 1988, Hird/Blaker appealed the denial to the INS's Administrative Appeals Unit ("AAU"), which affirmed the denial on April 18, 1988. The AAU concluded: "The record is not persuasive the duties of the job cannot be successfully performed by a skilled individual whose education and training falls short of a baccalaureate degree in a specialized area."

*Standard for Reviewing the INS's Decision*

■ The plaintiffs have sued under 28 U.S.C. § 1361, 5 U.S.C. § 701 *et seq.,* and 8

U.S.C. § 1329 to overturn the AAU's decision. The abuse of discretion standard applies to a court's review of an INS determination regarding a nonimmigrant visa petition. *See Occidental Engineering v. INS,* 753 F.2d 766, 768 (9th Cir.1985); *London Typographers, Inc. v. Sava,* 628 F.Supp. 570, 576 (S.D.N.Y.1986). This standard requires the reviewing court to uphold the INS's decision unless the decision was without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group. *See Li Cheung v. Esperdy,* 377 F.2d 819 (2d Cir.1967); *Wong Wing Hang v. INS,* 360 F.2d 715, 719 (2d Cir. 1966). The petitioner seeking a visa bears the burden of proof in any administrative proceeding regarding his visa status. *See* 8 U.S.C. § 1361; *see also K.C.P. Food Co., Inc. v. Sava,* 623 F.Supp. 1080, 1083 (S.D. N.Y.1985).

### Definition of "Professional" for H–1 Visa

The Act makes aliens "of distinguished merit and ability" eligible for H–1 visas. 8 U.S.C. § 1101(a)(15)(H)(i). The House Committee Report accompanying this legislation observed:

> Distinguished merit and ability implies a degree of skill and recognition substantially above that ordinarily encountered to the extent that a person so described is prominent or has a high level of education in his field of endeavor.

H.R.Rep. No. 851, 91st Cong., 2d Sess., reprinted in 1970 *U.S.Code Cong. & Admin.News* 2750, 2752–53.

The INS has interpreted this standard as requiring a showing 1) that the alien is a professional based on his academic credentials, *see Matter of Essex Cryogenics Indus., Inc.,* 14 I & N Dec. 196 (Dep.Assoc. Comm.1972); *Matter of Gen. Atomic Co.,* 17 I & N Dec. 532 (Comm.1980), or is prominent, renowned, or preeminent in his field, *see Matter of Shaw,* 11 I & N Dec. 277 (D.D.1965), and 2) that the position he hopes to fill requires the services of a professional or of someone who is prominent, renowned, or preeminent in his field.

*See Matter of Caron Int'l, Inc.,* Interim Decision 3085, at 6 (Comm.1988). If the alien is of distinguished merit and ability as the INS defines this term, but the job he seeks is not a position requiring someone of this stature, the alien is ineligible for an H–1 visa. *See Matter of Mapili,* 13 I & N Dec. 668, 669–70 (Regional Comm.1971).

Having equated "professional" with "distinguished merit and ability," the INS has endeavored to infuse that term with meaning. Congress has offered some guidance. Section 101(a)(32) of the Act provides:

> the term "profession" shall include but not be limited to architects, engineers, lawyers, physicians, surgeons, and teachers in elementary or secondary schools, colleges, academies, or seminaries.

8 U.S.C. § 1101(a)(32). The Supreme Court also has formulated a definition of "profession":

> The word implies professed attainments in special knowledge, as distinguished from mere skill,—a practical dealing with affairs, as distinguished from mere study or investigation; and an application of such knowledge to uses for others, as a vocation, as distinguished from its pursuit for its own purposes.

*United States v. Laws,* 163 U.S. 258, 266, 16 S.Ct. 998, 1001, 41 L.Ed. 151 (1896). Other courts have applied the Supreme Court's definition, finding that a "profession" requires knowledge or learning, as opposed to mere skill. *See, e.g., Pizarro v. District Director of INS,* 415 F.2d 481 (9th Cir.1969); *Javier v. INS,* 335 F.Supp. 1391 (N.D.Ill.1971); *Yau v. District Director of INS,* 293 F.Supp. 717 (C.D.Cal.1968); *Abbott v. United States,* 138 Ct.Cl. 459, 151 F.Supp. 929 (1957).

In determining what occupations constitute "professions" eligible for H–1 visas, the INS "focuses on the tasks, demands, duties, and actual requirements of the position in question." *Matter of Michael Hertz Assocs.,* Interim Decision 3046, at 3 (Comm. 1988). Several factors are relevant to this inquiry.

The most important factor involves whether the position requires "at least a baccalaureate degree awarded for aca-

demic study in a specific discipline or narrow range of disciplines." *Matter of Caron Int'l, Inc.,* Interim Decision 3085, at 4 (Comm.1988); *see also Matter of Michael Hertz Assocs.,* Interim Decision 3046, at 3 (Comm.1988) ("The professions normally require ... a minimum of a bachelor's degree in a specific field of study."). In two recent decisions—one of which was issued subsequent to the AAU's ruling in this case—the INS set forth its clearest articulation of this requirement. *See Matter of Caron Int'l, Inc.,* Interim Decision 3085, at 4–5 (Comm.1988); *Matter of Michael Hertz Assocs.,* Interim Decision 3046, at 3 (Comm. 1988).

First, the degree must involve "a precise and specific course of study which relates directly and closely to the position in question." *Matter of Michael Hertz Assocs.,* Interim Decision 3046, at 3 (Comm.1988). An occupation that requires a general degree such as business administration or liberal arts, therefore, is not a "profession." *See id.* at 3; *see also Matter of Caron Int'l, Inc.,* Interim Decision 3085, at 8 (Comm.1988) (finding that a Vice President for Manufacturing in a textile company is not a professional position because a person holding a general degree in business, engineering, or science could perform the job).

Second, "[t]he degree requirement must be an industry standard in parallel positions among similar firms and institutions." *Matter of Caron Int'l, Inc.,* Interim Decision 3085, at 5 (Comm.1988). A position does not constitute a profession just because the petitioning employer requires an individual holding a specific bachelor's degree. *See id.*

There are two situations in which the industry standard requirement *does not* apply. The first arises where the petitioner can "demonstrate specifically [that] the proposed duties are so specialized and complex that a university-educated person is actually *necessary*" and that the individual "would be *personally* involved in unusually complex duties...." *Id.* at 8. The second involves those occupations that are "in transition from nonprofessional to professional status." *Id.* at 5. For these, "it may be possible for some employers to establish the professional nature of positions by demonstrating that they have consistently required the higher standard of a specific baccalaureate or advanced degree for the more complex positions within their organizations." *Id.*

Finally, the employer must show that it "normally imposes [a degree] requirement" on the position. *Id.*

Although the INS appears to treat a bachelor's degree as a minimum requirement for classifying a position as professional, the agency's decisions have identified several other relevant factors. For example, in reversing an earlier ruling that medical technologists were not professionals, the INS observed that "professionalism is implicit in [a medical technologist's] many responsible duties as set out in the *Occupational Outlook Handbook.*" *Matter of Panganiban,* 13 I & N Dec. 581 (Dep.Assoc.Comm.1970). It also noted that "the U.S. Civil Service Commission has made a thorough study of federal clinical laboratory functions which has resulted in the establishment 'of two separate classifications: medical technician (nonprofessional) and medical technologist (professional).'" *Id.* Similarly, the INS reversed an earlier decision that medical record librarians were not professionals, noting: "It is clear from the comments of the Council of Education for the American Medical Association ... that the regard in which the medical record librarian is held has materially heightened in recent years." *Matter of Villanueva,* 13 I & N Dec. 733, 735 (Dep.Assoc.Comm.1971). The INS has rejected the DOT as a factor to consider, noting:

[A] reference in the DOT is not enough to establish the professional nature of an occupation. The Department of Labor occupational classification system and the DOT categorization of an occupation as professional and kindred or as being within a professional subject field are not directly related to consideration as to whether a position requires a member of

the professions as defined in section 101(a)(32) of the Act.

*Matter of Caron Int'l, Inc.,* Interim Decision 3085, at 9 (Comm.1988).

### Architectural Cost Estimator as a Professional Position

The inquiry here is whether the position of architectural cost estimator constitutes a professional position [1]—in short, as the AAU framed it here, whether an engineering degree is a "realistic prerequisite" to entry into the field. *See Matter of Shin,* 11 I & N Dec. 686 (1966).

In its appeal to the AAU, Hird/Blaker offered a variety of evidence to prove that the architectural cost estimator job it offered Lim required an engineering degree. It submitted a letter stating that the firm "always has had an individual with an engineering degree perform [architectural cost estimator] services." The letter described an architectural cost estimator's principal responsibilities as analyzing architectural drawings and construction blueprints, noting:

> [t]he scope of woodworking, including exclusions, limits, quantities, quality, code requirements, all must be interpreted. These blueprint interpretations require a considerable knowledge of construction industry technology and methods, as well as architectural materials. Such knowledge is limited to engineers who as a member of the professions are of distinguished merit and ability.

An affidavit by James D'Auria ("D'Auria"), an architect practicing since 1971, confirmed Hird/Blaker's conclusions, stating: "The responsibilities and duties as outlined in Mr. Blaker's letter are accurate and represent a level of functioning clearly requiring an engineering education." D'Auria added: "To the best of my knowledge other firms generally employ such individuals for such a position." The DOT indicated that the Labor Department classified the job of estimator as a professional position with a standard vocational preparation ("SVP") of 7.

Despite this evidence, the AAU ruled that the plaintiffs had failed to prove that an architectural cost estimator realistically required an engineering degree, premising its decision on three findings. The first two findings are reversed for having no rational basis. The case is remanded for the INS to reconsider the third finding regarding the industry standard and to determine whether a cost estimator is a "transitional occupation" exempt from the industry standard requirement.

### 1. An Architectural Cost Estimator's Duties

■ The AAU distinguished a cost estimator from an engineer, noting:

> The beneficiary's duties are to study blueprints and materials in order to estimate costs of construction or installation. The petitioner has stated "such estimators are almost always engineers of one kind or another...." The implication here is that there are instances where estimators are not engineers. The *Occupational Outlook Handbook,* 1986–1987 edition, states "engineers apply the theories and principles of science to the economical solution of practical technical problems." The job description does not indicate the beneficiary's use of scientific theories and principles.

The AAU offers no evidence to support this finding, and the conclusion has no rational basis. Excerpts from the *Occupational Outlook Handbook,* 1988–89 Edition, establish that applying scientific theories and principles is a critical element of a cost estimator's job:

> —[Cost] estimators compile and analyze data on all the factors that can influence costs—materials, labor, location, and special machinery.
>
> —Computers are increasingly used in estimating.... This leaves estimators

---

[1]. Hird/Blaker makes no claim that Lim is prominent, renowned, or preeminent in his field. Moreover, it is undisputed that Lim is a professional—Lim holds a Bachelor of Science degree with a major in civil engineering, and the AAU decision noted that Lim "may be academically qualified in a field or fields which may lead to professional classification...."

with more time to study and analyze projects.

—Cost estimators should have an aptitude for mathematics, be able to quickly analyze, compare, and interpret data, and be able to make sound and accurate judgments based on this knowledge.

*Id.* at 18–19.[2]  D'Auria, an experienced architect, confirmed this when he stated that "[t]he responsibilities and duties [of an architectural cost estimator with Hird/Blaker] ... represent a level of functioning clearly requiring an engineering degree." Most importantly, the *Occupational Outlook Handbook* observes: "[f]or beginning [cost estimator] in the Federal Government, applicants *must* have a bachelors degree with a major in engineering, mathematics, business administration, or a related subject." (Emphasis added).

### 2. Hird/Blaker's Practice

The AAU found that "[t]he record does not contain any evidence the petitioner has required the services of a professional in this or similar positions in the past." This finding is not supported by the record. In a letter to the INS's Eastern Regional Service Center that is part of the record, Hird/Blaker said: "This firm always has had an individual with an engineering degree perform [architectural cost estimator] services."  Ans.Ex. 1, at 25.

### 3. The Industry's Practice

■ The AAU found that "there is no evidence it is the normal practice for other firms engaged in the manufacture of specialty architectural products to require the services of members of the professions in parallel positions and the petitioner has not distinguished itself from comparable firms."  Again, this finding is not supported by the record.  Hird/Blaker's initial petition said: "[Cost] estimators are almost always engineers of one kind or another

(e.g. industrial, plant production, or mechanical, structural and or civil in construction)."  D'Auria's affidavit noted: "I am familiar with the Architectural Commercial Woodworking Industry and the position of 'estimator' in these firms. . . .  To the best of my knowledge other firms generally employ [engineers] for such a position."

Moreover, the *Occupational Outlook Handbook* contains numerous references to the importance of a cost estimator holding a baccalaureate degree:

—[In construction,] [p]ersons who combine ... experience [as a construction craft worker or as a contractor] with some postsecondary training in construction estimating or a bachelor's or associate's degree in civil engineering or building construction have the edge in landing jobs.

—In manufacturing, employers prefer persons with a degree in industrial engineering or in accounting, finance, or a related subject. . . .

—Job prospects should be best for highly experienced construction workers or those with a degree in engineering, construction, mathematics, or finance.

The AAU's terse finding that Hird/Blaker failed to establish that it is the "normal practice" for other firms in the industry to require cost estimators to have engineering degrees implies that Hird/Blaker failed to show that the practice was sufficiently widespread to constitute an industry standard.  The difficulty with this is that the INS has yet to articulate a definite test for determining when a degree requirement has become an industry standard.

In *Matter of Caron International, Inc.,* the INS said "[t]he degree requirement must be an industry standard in parallel positions among similar firms and institutions."  Interim Decision 3085, at 5 (Comm. 1988).  The agency also noted that the fact

---

2. The relevance of the *Occupational Outlook Handbook* to the INS's consideration of a visa petition cannot be disputed.  The AAU's decision at issue cited the *Handbook* ("The *Occupational Outlook Handbook,* 1986–87 edition, states. . . .") and the INS's Deputy Associate Commissioner has relied on the *Handbook* in

other cases involving classifying an occupation as a profession.  *See, e.g., Matter of Panganiban,* 13 I & N Dec. 581, 582 (Dep.Assoc.Comm.1970) ("the new (1970–1971) edition of the *Occupational Outlook Handbook* ... contains these observations. . . .").

that a degree is becoming "increasingly prevalent" or that the position is "normally filled" by people with degrees is insufficient to constitute an industry standard. However, these vague formulations offer a court little guidance for reviewing the INS's decisions.

A survey of the INS's rulings in this area reveals that the agency appears to have particular considerations in mind when it scrutinizes the industry standard. For example, the INS has considered an occupation a profession where the *Occupational Outlook Handbook* said the position required a degree, *see, e.g., Matter of Michael Hertz Assocs.,* Interim Decision 3046, at 4 (Comm.1988); *Matter of Panganiban,* 13 I & N Dec. 581, 582 (Dep.Assoc.Comm. 1970), where the industry's professional association made a degree a minimum entry requirement, *see, e.g., Matter of Michael Hertz Assocs.,* Interim Decision 3046, at 4 (Comm.1980); *Matter of Villanueva,* 13 I & N Dec. 733, 735 (Dep.Assoc.Comm.1971); *Matter of Panganiban,* 13 I & N Dec. 581, 582 (Dep.Assoc.Comm.1970), or where letters or affidavits from firms or individuals in the industry said that firms routinely employ and recruit only degreed individuals. *See Matter of Michael Hertz Assocs.,* Interim Decisions 3046, at 4 (Comm.1988).

From these cases, it might be possible to piece together a test for assessing the industry standard and then apply that test in this case. For example, a factor the INS consistently has cited appears to be a proclamation by the industry's professional association that a degree is a minimum requirement for entry into the field. But drawing a clear rule out of an agency's decisions is not the reviewing court's role. As the Supreme Court has observed: "It will not do for a court to be compelled to guess at the theory underlying the agency's action. . . ." *SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577–78, 91 L.Ed. 1995, *reh'g denied,* 332 U.S. 783, 68 S.Ct. 26, 92 L.Ed. 367 (1947); *see also Hall v. McLaughlin,* 864 F.2d 868, 878 (D.C.Cir.1989) (Williams, J., dissenting) ("While the . . . reconciliation of the Secretary's meandering opinions might represent a sustainable view, the Secretary nev-

er adopted it. . . . I would remand the case to enable the Secretary to construct a coherent rule. . . .").

On remand, the INS should articulate a test for assessing the industry standard and apply that test to Hird/Blaker's petition.

### 4. Cost Estimator As a Transitional Occupation

■ If Hird/Blaker fails to establish on remand that engineering degrees are sufficiently common among architectural cost estimators to constitute an industry standard, that does not end the inquiry. Subsequent to the AAU's ruling in this case, the INS recognized an exception to its industry standard rule, noting:

> The Service . . . recognizes that some occupations may be in transition from nonprofessional to professional status. In these transitional occupations, it may be possible for some employers to establish the professional nature of positions by demonstrating that they have consistently required the higher standard of a specific baccalaureate or advanced degree for the more complex positions within their organizations.

*Matter of Caron Int'l, Inc.,* Interim Decision 3085, at 5 (Comm.1988). On remand, the INS should examine whether an architectural cost estimator constitutes a "transitional occupation." If it does, the INS should issue the visa because Hird/Blaker has established that it consistently has required its cost estimators to hold engineering degrees.

Although the INS has yet to define what constitutes a "transitional occupation," there is evidence in the record that cost estimators fit this exception. Most notably, the *Occupational Outlook Handbook,* 1987–88 Edition, indicates that the "[j]ob prospects should be best for highly experienced construction workers or those with a degree in engineering, construction, mathematics, or finance." In discussing occupations it considered related to a cost estimator, the *Handbook* observed:

Other workers who must have an aptitude for mathematics, skill in analyzing, comparing, and interpreting facts, figures, and measurements quickly, and the ability to make sound and accurate judgments based on this knowledge are accountants, engineers, actuaries, mathematicians, and bank officers.

Whereas an architectural cost estimator at one time may have been an occupation similar to a general contractor as the INS first ruled in denying Hird/Blaker's application, advances in the manufacturing and construction industries appear to demand much more sophisticated skills from architectural cost estimators today. On remand, the INS should afford Hird/Blaker an opportunity to supplement the record on whether an architectural cost estimator is a transitional occupation.

*Conclusion*

For the reasons set forth above, the case is remanded for further consideration consistent with this opinion.

It is so ordered.